[No. D012079. Fourth Dist., Div. One. July 16, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
CALVIN BERNARD DAVIS et al., Defendants and Appellants.

**[Opinion certified for partial publication.[1]]**

---

[1]Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of part A (2) and B.

## COUNSEL

David L. Kelly and Janice Wellborn, under appointments by the Court of Appeal, for Defendants and Appellants.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, Keith I. Motley and Laura Whitcomb Halgren, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BENKE, J.**—Appellants Calvin Bernard Davis and Eddie James Spence, Jr., along with codefendant Louis Mosley were each convicted of one count of robbery. (Pen. Code,[2] § 211.) True findings were returned as to Spence, Davis and Mosley on allegations the robbery involved a great taking. (§ 12022.6, subd. (b).) True findings were returned as to Spence and Davis on allegations that during commission of the robbery they were armed with a firearm. (§ 12022, subd. (a).) It was also found true Spence had a prior conviction for a serious felony within the meaning of section 667, subdivision (a). Spence and Davis appeal, arguing instructional error. We affirm.

### FACTS

At 7:30 in the evening on September 29, 1989, Barbara Depew was working in the jewelry department of the Best store on El Cajon Boulevard in La Mesa. Depew heard a commotion, looked up and saw two Black men whom she later identified as Louis Mosley and Eddie Spence. Mosley was holding a sawed-off shotgun. Spence ordered Depew to open the jewelry cases, then used a pillowcase to collect jewelry. The men left with the jewelry which had an estimated value of $300,000.

Several other employees and customers observed the robbery. Mapuana Abel, a customer, heard yelling in the jewelry department and saw a man she later identified as Mosley holding a shotgun. Abel also identified Spence as involved in the crime. Kacee Miller, an employee, heard yelling and screaming in the jewelry department and saw three Black men running around. Miller heard one of them say "get down" and saw the employees and customers in the area comply. The three men were scattered about the jewelry department. One of them pointed a shotgun at Miller and told her to get down. One of them was collecting jewelry and putting it in a pillowcase. Donna Lacey was shopping at the Best store at the time of the robbery. She heard someone yell "This is a holdup. Everybody down." She turned and saw a man holding a shotgun. Lacey was unable to identify any of the three men involved in the robbery. James Jarvis, a San Diego police captain, was also in the store at the time of the robbery and it was his "impression" three persons were involved in the crime.

Bryan Whitney, a Best store employee, was talking to a friend in front of the store at approximately 7:30 in the evening. Whitney noticed a white, four-door sedan parked at the curb in front of the store, facing in the wrong direction. Whitney was sitting on the curb and the car's headlights restricted

---

[2]All statutory references are to the Penal Code unless otherwise specified.

his vision. After about five minutes the car sped away. Whitney first learned a robbery had occurred about two minutes after the car departed when a police officer asked him for a description of the vehicle.

At approximately 7:30 p.m. on September 22, 1989, Officer Juan Medero received a radio report concerning the Best store robbery, including a description of the car possibly involved in the crime. Medero quickly drove to the area of 70th and Alvarado Streets and positioned himself so he could see the traffic coming from the direction of the Best store about a mile away. About a minute and a half after the broadcast, the officer saw a car fitting the description given. It was on Alvarado driving from the direction of the Best store and toward the freeway. The car had no license plates. The officer could see a Black male driver, whom he later identified as Spence, and noticed another individual ducking down in the backseat.

When the officer pulled in behind the car, it accelerated rapidly, ran a red light and sped westbound on Interstate 8. Medero gave chase. Traveling at speeds as great as 95 miles per hour, the car headed west and then turned north onto Interstate 15. Medero, now joined by other police cars and a sheriff's helicopter, continued in pursuit, at times going 100 miles per hour.

The white sedan left the freeway at the Carmel Mountain off-ramp, started to skid, hit a car stopped at a light and traveled approximately about 200 feet east on Carmel Mountain Road where it stopped. The driver's door opened and Spence quickly got out. Medero got out of his car. Spence turned, looked at the officer and started to raise his hand. Fearing for his safety, the officer fired one shot, missing Spence. Within one or two seconds of Spence opening his door, the two doors on the passenger side of the car opened and two men, later identified as Davis and Mosley, jumped from the car and ran. The other pursuing officers had yet to arrive and Medero stayed in place, watching the directions the three men were running. Medero last saw Davis and Mosley running south toward an area of heavy brush.

As the car came to a stop, it was illuminated by the floodlight on the sheriff's helicopter. The officers in the helicopter saw the doors open and three men run from the car. Using standard procedure the helicopter followed the fleeing driver. The officers followed Spence and apprehended him after he ran across the freeway.

Other officers arrived and a search began for the two suspects still at large. Medero and another officer searched the bushy area where the men had fled but found no one. The helicopter crew then reported a Black male running on a nearby residential street. The officers went to the location and saw Mosley

running in the beam of the helicopter searchlight. He stopped and was placed under arrest.

After searching in the residential area several hours, the officers gave up the hunt. Officers Adams and Gain were assigned to collect some pieces of jewelry found scattered about a dirt area near the car. They recovered jewelry still bearing Best store tags. As this search was underway, one of the officers heard something in the brush. The officers investigated and found a man, later indentified as Davis, under some bushes about 20 feet from where the jewelry was recovered. Davis was placed under arrest.

The officers found two pillowcases in the white sedan, one on the front floorboard and one on the rear floorboard, each containing jewelry taken in the robbery. The officers found a loaded sawed-off shotgun and a license plate on the front seat of the car.

## DISCUSSION

### A. Davis Appeal

#### 1. Jury Unanimity and Theories of Criminal Participation

Appellant Davis urges the trial court erred in failing sua sponte to instruct in the terms of CALJIC No. 17.01, which states that where the prosecution has introduced evidence tending to prove more than one act upon which a conviction for an offense may be based, the defendant may be found guilty if the proof shows beyond a reasonable doubt that he committed any one or more of such acts. However, the instruction requires that in order to return a verdict of guilty on the charge, all jurors must agree the defendant committed the same act. Davis contends the instruction is necessary because his conviction for the robbery could have been based upon one of two theories of criminal responsibility, each dependent on a different finding of fact.

In support of his argument, Davis observes evidence was presented he entered the store and thus was a perpetrator of the robbery. He notes, however, that evidence was also presented supporting the conclusion he remained in the car during the robbery and was thus an aider and abettor. He urges it is possible the jurors were split on what he did, with some jurors believing he entered the store and directly participated in the crime, while others may have concluded he did not enter the store but remained in the car, as an aider and abettor. Under such a split-jury scenario, some of the jurors who believed he entered the store might have believed the evidence insufficient to prove him an aider and abettor.

Davis argues a verdict which permits such a split view of facts underlying his liability is impermissible. He concludes all jurors must unanimously agree upon the same facts giving rise to criminal liability, and the giving of CALJIC No. 17.01 assures a guilty verdict will be based upon such unanimity. We reject Davis's arguments. In so doing, we part company with *People v. Melendez* (1990) 224 Cal.App.3d 1420 [274 Cal.Rptr. 599], which requires such factual unanimity.

### a. *Problem of Unanimous Verdicts*

In California, as in most American jurisdictions, criminal verdicts must be unanimous. (*People* v. *Jones* (1990) 51 Cal.3d 294, 321 [270 Cal.Rptr. 611, 792 P.2d 643].) However, about what must jurors unanimously agree? In a first degree murder case for example, guilt may be based upon either a theory of premeditation and deliberation or felony murder. Criminal responsibility may be further refined, based on one of at least three additional theories: direct participation, aiding and abetting and coconspiracy. Each of these theories of, and responsibility for, the crime may in turn be even further refined, based upon different evidence or different interpretations of evidence.

Thus, in a given case the evidence may reasonably lead some jurors to conclude the defendant was guilty of first degree murder based upon a finding of premeditation and deliberation while some reject that theory but find guilt based upon the felony murder rule. Some of those jurors finding premeditation and deliberation may find the defendant criminally responsible based on direct participation while others adamantly reject such a conclusion but firmly believe the defendant responsible as an aider and abettor. Those finding a felony murder may be divided along the same lines.

The diversity of factual findings or interpretations leading to a unanimous verdict of murder in the first degree may be even further diversified. Those jurors, for example, finding a premeditated first degree murder based on direct participation may hotly disagree on the specific evidence supporting that conclusion. Some may believe the jailhouse "snitch" to whom the defendant allegedly confessed but doubt the eyewitnesses. Others may reject the confession but accept as unassailable the testimony of the witnesses. Still others may doubt each form of evidence standing alone but find them sufficiently corroborative to support a finding of direct participation in a premeditated murder.

It is therefore possible a jury may unanimously agree a defendant is guilty of first degree murder but disagree entirely about the theory of the crime, the theory of criminal responsibility and the evidence supporting each.

### b. *Sullivan and Gipson Rules*

Since it reveals much about the issue, we begin by exploring the fundamental disagreement over what a verdict of guilt should mean. It appears there are two general philosophies of requisite jury unanimity. The first, known as the *Sullivan* rule (see *State* v. *Sullivan* (1903) 173 N.Y. 122 [65 N.E. 989, 989-990]), requires the jurors unanimously agree about the ultimate issue, that is, whether the defendant is guilty of the charged offense.

The *Sullivan* rule takes as irrelevant any jury disagreement on subordinate issues. It matters not that jurors may disagree over the theory of the crime, for example, whether the situation involves felony murder or premeditated murder. Nor does it matter that they disagree on the theory of participation, for example, whether there was direct participation or aiding and abetting or coconspiracy. Nor does it matter that they disagree about the facts proving any of these theories. If each juror concludes, based on legally applicable theories supported by substantial evidence, that the defendant is guilty of the charged offense, the defendant is properly found guilty even if the jurors disagree about the particular theories or facts.

The Supreme Court of Wisconsin in *Holland* v. *State* (1979) 91 Wis.2d 134 [280 N.W.2d 288, 292-293], explained the *Sullivan* rule in this way: "Unanimity is required only with respect to the ultimate issue of the defendant's guilt or innocence of the crime charged, and unanimity is not required with respect to the alternative means or ways in which the crime can be committed. The cases across the country—New York, Michigan, Washington— recognize and note that it is sufficient that all jurors unanimously agree on their ultimate conclusion that the defendant was guilty of the crime charged, though they may not agree on the manner in which the defendant participated in the crime if under any of the alternative ways the defendant would be guilty of the crime charged. To permit any other conclusion would be to permit the guilty defendant to escape accountability under the law because jurors could not unanimously choose beyond a reasonable doubt which of several alternative ways the defendant actually participated, even though all agree that he was, in fact, a participant."

As was noted by the Supreme Court of Utah: "The *Sullivan* [rule] has been adopted in most other jurisdictions that have considered the issue." (*State* v. *Tillman* (Utah 1987) 750 P.2d 546, 563, fn. 53; see also *Rice* v. *State* (1987) 311 Md. 116 [532 A.2d 1357, 1362-1365, 75 A.L.R.4th 73] (*Rice*); *State* v. *James* (Alaska 1985) 698 P.2d 1161, 1164; *People* v. *Travis* (1988) 170 Ill.App.3d 873 [121 Ill.Dec. 830, 525 N.E.2d 1137, 1148]; Annot. (1990) 75 A.L.R.4th 91.)

While the *Sullivan* rule may have been accepted by most jurisdictions, the "ultimate issue" unanimity it espouses has not been uniformly embraced. This is especially true in federal jurisdictions.

In *United States* v. *Gipson* (5th Cir. 1977) 553 F.2d 453, 457-458, the court reviewed the requirement of unanimous verdicts in criminal cases and came to this conclusion: "The unanimity rule thus requires jurors to be in substantial agreement as to just what a defendant did as a step preliminary to determining whether the defendant is guilty of the crime charged. Requiring the vote of twelve jurors to convict a defendant does little to insure that his right to a unanimous verdict is protected unless this prerequisite of jury consensus as to the defendant's course of action is also required." (Fn. omitted.) (For ease of discussion we will refer to this formulation of the jury unanimity issue as the *Gipson* rule.) This acceptance of *Gipson* in the federal courts was noted by Justice Blackmun in his separate concurring opinion in *McKoy* v. *North Carolina* (1990) 494 U.S. 433, 449, fn. 5 [108 L.Ed.2d 369, 385, 110 S.Ct. 1227], wherein he stated: "In federal criminal prosecutions, where a unanimous verdict is required, the Courts of Appeal are in general agreement that '[u]nanimity . . . means more than a conclusory agreement that the defendant has violated the statute in question; there is a requirement of substantial agreement as to the principal factual elements underlying a specific offense.' (*United States* v. *Ferris* (9th Cir. 1983) 1405, 1407.)" (See also *U.S.* v. *Holley* (5th Cir. 1991) 942 F.2d 916, 925-927; dis. opn. of White, J., *Schad* v. *Arizona* (1991) 501 U.S. __, __-__ [115 L.Ed.2d 555, 578-580, 111 S.Ct. 2491] (*Schad*).)

Some state courts in one manner or another have accepted *Gipson*'s "principal factual elements" test of requisite jury unanimity. (See, e.g., *State* v. *Parker* (1991) 124 N.J. 628 [592 A.2d 228, 231-233]; *Probst* v. *State* (Del. Super. Ct. 1988) 547 A.2d 114, 120-121; *State* v. *Jennings* (1990) 216 Conn. 647 [583 A.2d 915, 922-924]; *State* v. *Boots* (1989) 308 Ore. 371 [780 P.2d 725, 729-731].)[3]

There is a further aspect of the issue which bears emphasis. Courts adhering to the *Sullivan* and *Gipson* rules have engaged in a further inquiry relating the nature of criminal statutes to the issue of jury unanimity. In general the unanimity question arises because statutes under single titles define crimes that can be committed in a variety of distinct ways, for example, premeditated murder, and accidental murder during the course of a

---

[3]Some states seem to have at least nominally accepted both tests. Alaska, for example, seems to accept the *Sullivan* test as to general theories of guilt but requires unanimity concerning the actus reus aspect of the crime. (See, e.g., *State* v. *James*, *supra*, 698 P.2d at pp. 1166-1167.)

felony are both defined by our Penal Code as a single crime, murder of the first degree. Thus, many courts which apply the *Sullivan* rule have, nonetheless, concluded there are due process limitations on the legislative power to create single crimes that can be committed in a variety of ways.

Recently the United States Supreme Court in *Schad, supra,* 501 U.S. ___ [115 L.Ed.2d 555], dealt with the issues of jury unanimity and permissible single crime definition. For purposes of our inquiry the case is significant in that it illustrates clearly the positions various courts have taken on the issues and deals with them at length, albeit with divergent views of their acceptability. Given the significance of the case and the plurality nature of its opinion, we deal with it in depth.

In *Schad* it was possible to base a finding of first degree murder on a theory of premeditation or felony murder. The Supreme Court considered whether it was constitutionally required, in the context of a capital case, for the jury to unanimously agree on the theory of first degree murder underlying its verdict or whether it could properly reach one verdict based on any combination of alternate theories of first degree murder all contained in the same statute.

Justice Souter, in an opinion joined by the Chief Justice and Justices O'Connor and Kennedy, characterized the issue not as one involving jury unanimity, but rather one concerned with the permissible breadth of criminal definition. (*Schad, supra,* 501 U.S. at pp. ___-___ [115 L.Ed.2d at pp. 564-565].)

Justice Souter noted the long-standing rule that an indictment need not specify which overt act, among several named, was the means by which a crime was committed. Nor was it necessary jurors agree on the preliminary factual matters that underlie a verdict whether involving the actus reus or the mens rea requirement of a given crime. (*Schad, supra,* 501 U.S. at p. ___ [115 L.Ed.2d at p. 565].)

The plurality opinion, however, found there were due process limitations on the power of the state to define crimes. Justice Souter stated: "[N]othing in our history suggests that the Due Process Clause would permit a State to convict anyone under a charge of 'Crime' so generic that any combination of jury findings of embezzlement, reckless driving, murder, burglary, tax evasion, or littering, for example, would suffice for conviction." (*Schad, supra,* 501 U.S. at p. ___ [115 L.Ed.2d at p. 566], fn. omitted.)

The issue thus became the definition of the limitation. Speaking for the plurality, Justice Souter noted the Supreme Court had never addressed the

issue, although a body of federal law beginning with the decision in *Gipson* did deal with the question. The opinion noted *Gipson* advocated a "distinct conceptual groupings" analysis that allowed jurors to disagree on the theory of conviction as long as the differing theories have a sufficient conceptual similarity. Significantly, the plurality rejected the *Gipson* approach. The opinion noted classification by conceptual grouping expressed a conclusion about permissible crime definition but essentially provided no test for such determination. (*Schad, supra,* 501 U.S. at pp. __ [115 L.Ed.2d at pp. 566-569].)

Justice Souter concluded no single criterion would suffice to determine the permissible constitutional limitation on crime definition. The plurality opinion states: "We are convinced, however, of the impracticability of trying to derive any single test for the level of definitional and verdict specificity permitted by the Constitution, and we think that instead of such a test our sense of appropriate specificity is a distillate of the concept of due process with its demand for fundamental fairness [citation], and for the rationality that is an essential component of that fairness." (*Schad, supra,* 501 U.S. at p. __ [115 L.Ed.2d at p. 569].)

In applying this conceptual approach in a given case, Justice Souter noted it was necessary to look to history and general practices as guides to values "as well as to narrower analytical methods of testing the moral and practical equivalence of the different mental states that may statisfy the mens rea element of a single offense." (*Schad, supra,* 501 U.S. at p. __ [115 L.Ed.2d at p. 569].)

Justice Souter began his analysis of the definitional specificity of Arizona's first degree murder statute by noting the necessity of judicial restraint. He observed the difficulty of determining whether a set of differing elements defined separate crimes or merely defined separate means for committing the same crime. He noted such value choices were more appropriately made by the Legislature and "Respect for this legislative competence counsels restraint against judicial second-guessing." (*Schad, supra,* 501 U.S. at p. __ [115 L.Ed.2d at p. 569].) He further noted that as to such matters the state Legislature's definition of the elements of the offense is usually dispositive. (*Id.* at pp. __-__ [115 L.Ed.2d at pp. 569-570].)

Looking to the important, but not solely determinative, factors of history and practice, Justice Souter further noted Arizona's legislative decision to equate the mental element of premeditation with that necessary for felony murder had a long history in Anglo-American law and was the position of many states. "Such historical and contemporary acceptance of Arizona's

definition of the offense and verdict practice is a strong indication that they do not ' "offen[d] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental" ' [citation]." (*Schad, supra,* 501 U.S. at p. __ [115 L.Ed.2d at p. 572].)

The plurality then turned to nonhistorical or comparative practice criteria for analyzing single crimes that can be committed by different methods. While again disdaining any single criteria the opinion noted, however, that if different states of mind were defined as sufficient to establish the same crime "they must reasonably reflect notions of equivalent blameworthiness or culpability, whereas a difference in their perceived degree of culpability would be a reason to conclude that they identified different offenses altogether." (*Schad, supra,* 501 U.S. at p. __ [115 L.Ed.2d at p. 573].) Justice Souter found there was no such disparity in Arizona's manner of defining first degree murder. (*Id.* at pp. __-__ [115 L.Ed.2d at p. 572-573].)

Writing separately, Justice Scalia agreed with Justice Souter that it was constitutionally permissible for Arizona to treat both premeditated and felony murder as a single crime. Indeed, he states the *Sullivan* rule "is not only constitutional, it is probably indispensable in a system that requires a unanimous jury verdict to convict. When a woman's charred body has been found in a burned house, and there is ample evidence that the defendant set out to kill her, it would be absurd to set him free because six jurors believed he strangled her to death (and caused the fire accidentally in his hasty escape), while six others believed he left her unconscious and set the fire to kill her." (*Schad, supra,* 501 U.S. at p. __ [115 L.Ed.2d at p. 577].)

Justice Scalia, however, did not agree in total with the reasoning of the plurality. He did agree it would be unconstitutional to create a single "umbrella" crime, that is, one that could be committed by very different means, robbery or tax evasion for example. However, because the issue in question was one of procedural or substantive due process, Justice Scalia would end his analysis of the constitutional propriety of Arizona's unitary first degree murder offense by noting the offense was one that had been historically treated by a large number of American jurisdictions as a unitary crime that merely had several possible forms of commission. (*Schad, supra,* 501 U.S. at p. __ [115 L.Ed.2d at pp. 577-578].) In this respect, Justice Scalia makes the interesting observation that but for this historical aspect of due process analysis he might be aligned with the dissenters, who believed Arizona's unitary crime of first degree murder to be unconstitutional. He concludes the plurality provide no satisfactory explanation for why it is permissible (other than the "endorsement of history") to combine in one offense killings in the course of felony and premeditated killings. (*Schad, supra,* 501 U.S. at p. __ [115 L.Ed.2d at p. 578].)

In the dissenting opinion joined in by Justices Marshall, Blackmun and Stevens, Justice White began by noting: "As *In Re Winship*, 397 U.S. 358 . . . . , makes clear, due process mandates 'proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [the defendant] is charged.' (*Id.*, at 364.)" (*Schad, supra*, 501 U.S. at p. __ [115 L.Ed.2d at p. 578].)

Justice White, essentially accepting the *Gipson* rule, believed the plurality had misconstrued the issue. Justice White found no lack of deference to the legislative prerogatives of the State of Arizona in simply recognizing that Arizona's first degree murder statute created three different ways the crime could be committed. Justice White noted that felony murder and premeditated murder have very different mental elements, and a verdict of guilt as to first degree murder gives no clue as to whether the jury believed the defendant premeditated the killing or whether the killing occurred, for example, accidentally during the commission of a felony. The dissent concludes it would be constitutionally improper for a defendant to be convicted of first degree murder when six jurors believe he premeditated the killing and when six others believe the killing was not premeditated but occurred during the commission of a felony. (*Schad, supra*, 501 U.S. at p. __ [115 L.Ed.2d at pp. 579-580.)[4]

### c.  *Jury Unanimity as Applied to Theories of Criminal Participation*

Several out-of-state cases have dealt specifically with the issue of requisite jury unanimity and theories of criminal participation now before this court. *Holland v. State, supra*, 280 N.W.2d 288, one of the leading cases on the issue, was concerned with a murder conviction in which the evidence allowed a finding the defendant was criminally responsible either as the killer or an aider and abettor or a coconspirator. (*Id.* at p. 290.) The court framed the issue in this way: "Unanimity demands that the jury be agreed that the defendant committed a specific act the law prohibited. The issue is how specifically the prohibited act must be defined. The state argues that the act for which party to a crime liability is imposed is participation in whatever form; the defendant argues liability is not proven until there is jury unanimity concerning the manner of participation." (*Id.* at p. 291.)

The court reviewed the historical development of the theories of vicarious criminal liability, cited the *Sullivan* rule and then stated: "Here we have a

---

[4]In his recent and remarkable dissenting opinion in *Bouwkamp v. State* (Wyo. 1992) 833 P.2d 486, Chief Justice Urbigkit of the Wyoming Supreme Court takes strong issue with the reasoning of both the plurality and concurring opinions in *Schad* and with the *Sullivan* rule in general. Justice Urbigkit believes the trend is away from *Sullivan* and toward *Gipson*. The justice finds California law on unanimity both expansive and confusing. (*Id.* at pp. 530-532.)

single offense for which the defendant could be found liable in three alternative ways—direct commission, aiding and abetting, and conspiracy—when the jury unanimously concluded the defendant was guilty of second-degree murder. The jury unanimously found participation, and it was not necessary that it be agreed as to the theory of participation. To require unanimity as to the manner of participation would be to frustrate the justice system, promote endless jury deliberations, encourage hung juries, and precipitate retrials in an effort to find agreement on a nonessential issue." (*Holland* v. *State, supra,* 280 N.W.2d at p. 293; see also *Com.* v. *Ramos* (1991) 31 Mass.App. 362 [577 N.E.2d 1012, 1014-1015]; *State* v. *Travis, supra,* 525 N.E.2d at pp. 1146-1148.)

The Canadian Supreme Court agrees. In *R.* v. *Thatcher* (1987) 1 S.C.R. 652, the court considered whether it was necessary the jury unanimously agree on the theory of criminal participation. The court described the issue as a difficult one but after a review of the development of relevant legal concepts concluded no unanimous agreement was required on the theory of participation in the charged offense. The court stated: "The Crown is not under a duty to separate the different forms of participation in a criminal offense into counts. Obviously, if the charge against [the defendant] had been separated into different counts, he might well have been acquitted on each count notwithstanding that each and every juror was certain beyond a reasonable doubt either that [the defendant] personally killed his ex-wife or that he aided and abetted someone else who killed his ex-wife." (*Id.* at p. 694; see also Gelowitz, *Jury Unanimity on Questions of Material Fact: When Six and Six Do Not Equal Twelve* (1987) Q.L.J. 66; McKinnon, *Jury Unanimity: A Reply to Gelowitz and Stuart* (1986) 51 C.R. (3d) 134.)

### d. *California and Requisite Jury Unanimity*

In general California decisional law has followed the *Sullivan* rule and does not require jurors unanimously agree on the theory supporting a conviction. The issue, however, is not without complexity, disagreement and confusion as to whether unanimity is required where differing facts may support conviction of a single offense.

Quoting at length from *Sullivan,* our Supreme Court in *People* v. *Chavez* (1951) 37 Cal.2d 656, 670-672 [234 P.2d 632], concluded the jury need not unanimously agree on the theory of supporting a conviction for first degree murder. (See also *People* v. *Adcox* (1988) 47 Cal.3d 207, 243 [253 Cal.Rptr. 55, 763 P.2d 906].) The California Supreme Court has also concluded jurors need not agree on the method of theft in a prosecution for larceny (*People* v.

*Nor Woods* (1951) 37 Cal.2d 584, 586 [233 P.2d 897]) or the felony underlying a charge of burglary (*People* v. *Failla* (1966) 64 Cal.2d 560, 567-569 [51 Cal.Rptr. 103, 414 P.2d 39]). Recently the court concluded in *People* v. *Edwards* (1991) 54 Cal.3d 787, 824 [1 Cal.Rptr.2d 696, 819 P.2d 436], that a jury need not agree on which acts constituted lying in wait charged as a special circumstance. (Curiously a split of authority exists on whether a jury must unanimously agree on at least one charged overt act in a prosecution for conspiracy. *People* v. *Ramirez* (1987) 189 Cal.App.3d 603, 611-615 [233 Cal.Rptr. 645] [yes]; *People* v. *Cribas* (1991) 231 Cal.App.3d 596, 611-612 [282 Cal.Rptr. 538] [no]; *People* v. *Jones* (1986) 180 Cal.App.3d 509, 515-517 [225 Cal.Rptr. 697] [no].) It appears at least one member of the California Supreme Court would apply the *Gipson* rule in some situations. (See dis. opn. of Mosk, J., *People* v. *Jones*, *supra*, 51 Cal.3d at pp. 326-329.)

A related issue of jury unanimity is of analytical importance. Beginning with *People* v. *Castro* (1901) 133 Cal. 11 [65 P. 13], and *People* v. *Williams* (1901) 133 Cal. 165 [65 P. 323], the courts of this state have required the jury unanimously agree on the specific offense to be proved. (See *People* v. *Jones*, *supra*, 51 Cal.3d at pp. 305-307; *People* v. *Dell* (1991) 232 Cal.App.3d 248, 265-266 [283 Cal.Rptr. 361]; *People* v. *Madden* (1981) 116 Cal.App.3d 212, 215-216 [171 Cal.Rptr. 897].) While sometimes discussed in terms of the jury being required to agree on the "act" committed by the defendant, this statement of the issue seems to be driven by the context in which the question generally arises. ■ Thus, when one count of rape is charged but the evidence demonstrates three separate "acts" of rape, it is convenient to discuss the issue of required jury unanimity by stating the jury must unanimously agree on the "act" supporting the single count. What we conclude is actually required, however, is unanimous agreement that the defendant is criminally responsible for *one discrete criminal event*. Were this not the case, then *Castro* and *Williams* would be seemingly inconsistent with those later California Supreme Court cases holding that the jury need not unanimously agree about the theory of guilt since a difference of opinion about theory can only arise from a difference of opinion about what the defendant, mentally or physically, did.

As we noted at the outset of this opinion, some California cases disagree with this formulation of the *Castro/Williams* holding and, essentially agreeing with the *Gipson* rule, conclude instead that it is necessary jurors unanimously agree on just what the defendant did. (See *People* v. *Melendez*, *supra*, 224 Cal.App.3d 1420, 1432-1434; *People* v. *Gary* (1987) 189 Cal.App.3d 1212, 1218 [235 Cal.Rptr. 30]; *People* v. *Laport* (1987) 189 Cal.App.3d 281, 283-284 [234 Cal.Rptr. 399].)

In *People* v. *Bergschneider* (1989) 211 Cal.App.3d 144, 155-156 [259 Cal.Rptr. 219], this court noted: "As we understand [appellant's] contention, he asserts he could not properly be convicted of forcible oral copulation if six jurors believed he physically resisted Tonia's efforts to push his head away whereas the other six jurors believed his threat of restriction constituted duress. The argument appears to be contrary to the line of cases holding the jury need not be unamnious as to the 'theory' of the crime. [Citations.] Other generally more recent cases, however, have suggested that federal constitutional principles may require that the jury unanimously agree on the facts constituting each element of the offense. [Citations.] Since the different 'theories' may be based on different sets of underlying facts, there is an inherent tension between these two lines of cases which has yet to be resolved."

This tension is demonstrated by a disagreement in the California cases concerning the need for unanimity on the theory of criminal participation. In *People* v. *Forbes* (1985) 175 Cal.App.3d 807, 816-817 [221 Cal.Rptr. 275] (*Forbes*), the court first noted the rule that where the evidence shows more than one act that could constitute the charged offense, it was necessary the jury unanimously agree on the act supporting a finding of quilt. "However, such instruction has uniformly been held unnecessary where a single charged offense is submitted to the jury on alternative legal theories of culpability, a common example being where a charge of first degree murder is supported on alternate theories of felony murder or willful, deliberate and premeditated killing. (Pen. Code, § 189.) It is held sufficient that each juror is convinced beyond a reasonable doubt that the defendant committed the offense *as that offense is defined by statute*. [Citations.] An aider and abettor is defined by California statute as a principal in the offense equally guilty with the perpetrator. [Citations.] It follows that jurors need not unanimously agree by which statute the defendant attains his status as a principal in the crime." (*Ibid.*; see also *People* v. *Vargas* (1988) 204 Cal.App.3d 1455, 1465-1466 [251 Cal.Rptr. 904]; *People* v. *Burns* (1987) 196 Cal.App.3d 1440, 1457-1459 [242 Cal.Rptr. 573]; *People* v. *Harris* (1985) 175 Cal.App.3d 944, 952-953 [221 Cal.Rptr. 321].)

In *People* v. *Melendez, supra,* 224 Cal.App.3d 1420, the court came to a different conclusion. Melendez and a codefendant, Guzman, were jointly tried for robbery and assault with a deadly weapon. There was evidence Melendez, Guzman and a third man were involved in the robbery of a store. The jury was instructed Melendez could be criminally liable either as an active participant, an aider and abettor or a conspirator. The People did not argue appellant was an active participant in the crime; instead they based

their case on the aiding and abetting and conspiracy theories. The trial court did not instruct in the terms of CALJIC No. 17.01. (224 Cal.App.3d at pp. 1423-1426.)

On appeal appellant argued he was deprived of his right to a unanimous verdict because the prosecution relied on two different theories of liability and the jurors were not told they were required to unanimously agree as to the acts on which liability was based. Specifically, appellant argued different jurors might have found criminal liability arose out of different acts allegedly committed by Melendez. Melendez was not in the store at the time of the robbery, his involvement in the crime was based on his contact with the robber before and after the taking. Melendez contended some jurors might have concluded he was a conspirator based on certain evidence but, because of a doubt about other evidence, he was not an aider and abettor. Other jurors might have concluded he was an aider and abettor based on the evidence rejected by the other jurors but could have concluded, on other evidence, that he was a conspirator. Melendez might, therefore, have been convicted of the robbery when the jury was not unanimous about the acts he committed. (*People* v. *Melendez*, *supra*, 224 Cal.App.3d at pp. 1424-1427.)

Among other contentions the Attorney General argued a unanimity instruction was not required because there was but one act, the robbery, and there is no requirement jurors unanimously agree on the theory of guilt. The Court of Appeal rejected the People's argument. The court concluded the rule the jurors need not unanimously agree on the theory of guilt was only applicable when, while separate theories of guilt could be gleaned from a set of facts, there was but one set of facts. If the different theories of guilt arose from different conclusions concerning the facts, that is, some jurors believed one factual scenario while some accepted another, then the rule did not apply.

The court crystallized its rule in this way: "Where a single crime can be proven by different theories based on different acts and at least two of these theories rely on different evidence, and where the circumstances demonstrate a reasonable possibility that a juror will find one theory proven and the other not proven but that all of the jurors will not agree on the same theory, a unanimity instruction must be given." (*People* v. *Melendez*, *supra*, 224 Cal.App.3d at pp. 1433-1434.)

The issue was recently discussed by our Supreme Court in *People* v. *Beardslee* (1991) 53 Cal.3d 68 [806 P.2d 1311]. In *Beardslee* the defendant was charged with murder. The prosecutor argued guilt could be based on

either of two theories, that is, defendant fired the fatal shot or was liable as an aider and abettor. It was argued on appeal the trial court erred in failing to instruct that to return a verdict of guilt it was necessary the jury unanimously agree on at least one of the theories. (*Id.* at p. 92.)

The court noted the rule a jury must be unanimous with regard to acts that could have been charged as separate offenses but that a conviction of first degree murder was permissible even though the jurors did not unanimously agree about the theory. The court noted that pursuant to the latter rule, it was held in *People* v. *Forbes, supra,* 175 Cal.App.3d at pages 816-817, that unanimous agreement was unnecessary concerning whether the defendant was a perpetrator or an aider and abettor. (*People* v. *Beardslee, supra,* 53 Cal.3d at p. 92.)

In *Beardslee,* the Supreme Court was urged to reject the *Forbes* rule since a determination of whether a defendant was an aider and abettor was not a choice between legal theories but rather a determination of the act the defendant committed. The court in *Beardslee* did not conclude *Forbes* was in error. Noting that a unanimity instruction is required only if the jurors could disagree about the act the defendant committed and yet convict him of the crime, the court observed that under the facts of the *Beardslee* case any juror who found defendant a participant would necessarily find him an aider and abettor. This being the case no instruction on unanimity was required. (*People* v. *Beardslee, supra,* 53 Cal.3d at pp. 92-94.)

e.  *Analysis and Conclusion*

The question of requisite jury unanimity is a fundamental one that defines the very task of criminal juries. The *Sullivan* rule has long been the position of the California Supreme Court. ▮▮▮ In California it is unnecessary jurors unanimously agree on the theory of criminal culpability supporting their unanimous conclusion of guilt. We conclude the complexity of the law and the complexity of criminal conduct make any other position so potentially instructionally difficult, and complicated, and so potentially confusing to jurors that any other rule is, as a practical matter, unacceptable. (See *Holland* v. *State, supra,* 280 N.W.2d at p. 293; *State* v. *Russell* (Utah 1987) 733 P.2d 162, 167-168.)

The *Sullivan* rule, however, is not merely a rule of convenience, it expresses a position on the basic task of the jury. It is the Legislature which defines crimes and determines who is responsible for criminal acts. While

that power, like any power, can be abused, the discretion the Legislature exercises in this regard is very broad. Indeed, the power is so broad that most courts which have considered the question have found it permissible for the states to define as the single crime of first degree murder conduct running from long considered cold-blooded killings to accidental killings during the commission of felonies.

The position of the courts adhering to the *Sullivan* rule is that where there is a single offense and a single charge, it is the task of each juror to conclude, based perhaps on very different theories, whether the defendant is guilty or not guilty. It is simply of no consequence that some jurors believe the defendant is guilty based on one theory while others believe he is guilty on another even when the theories may be based on very different and even contradictory conclusions concerning, for example, the defendant's basic intent in committing the crime.

We see no reason to apply a different rule with regard to theories of criminal participation. The Legislature has determined those who aid and abet and those who actually perpetrate the offense are principals and equally culpable. (§ 31.) Clearly, criminal law is ultimately concerned with ascribing criminal responsibility for discrete events. This is done by defining crimes, for example, first degree murder, and by determining who will be responsible for those crimes, for example, aider and abettors and direct perpetrators. Once the discrete event is identified, for example, the killing of a particular human being, the theory each individual juror uses to conclude the defendant is criminally responsible need not be the same and, indeed, may be contradictory.

In light of our conclusions, we believe *Melendez* to be wrongly decided. Jurors need not unanimously agree on whether the defendant is an aider and abettor or a principal even when different evidence and facts support each conclusion. In the present case, therefore, the trial court was not required to instruct concerning jury unanimity with regard to the various theories of criminal participation.

We therefore conclude the giving of CALJIC No. 17.01 is inappropriate in those cases where multiple theories or acts may form the basis of a guilty verdict on one discrete criminal event. We find CALJIC No. 17.01 an appropriate instruction when conviction on a single count could be based on two or more discrete criminal events. In such cases it is appropriate the jurors all agree the defendant is responsible for the same discrete criminal event. As we have noted, however, the jurors need not agree on the theory of criminality or the theory of criminal participation.

2., B.*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

Judgment affirmed.

Nares, J., concurred. Todd, Acting P. J., concurred in the result.

Appellants' petition for review by the Supreme Court was denied October 22, 1992.

---

*See footnote, *ante*, page 28.