[No. D017156. Fourth Dist., Div. One. Nov. 22, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
VICTOR MANUEL SOLIS, Defendant and Appellant.

**[Opinion certified for partial publication.[1]]**

[1]Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts I and II.

## COUNSEL

Charles R. Khoury, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Holly D. Wilkens and Bradley A. Weinreb, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

FROEHLICH, J.—A jury convicted Victor Manuel Solis (Solis) of murder in the second degree of Kenneth O'Brien (O'Brien) (Pen. Code,[2] § 187, subd. (a)) and found Solis had been personally armed with a handgun (§ 12022, subd. (a)(1)). The trial judge sentenced Solis to a total term of 16 years to life.

O'Brien was shot by a confederate of Solis. Solis's conviction was based upon his participation as an aider and abettor. On appeal, Solis raises a number of issues, which we elect to categorize in the Discussion portion of this opinion as follows: I. Error in the exclusion of certain defense evidence; II. Miscellaneous instructional error; and III. Instructional error in failing to submit to the jury instructions pertaining to the "predicate" or "target" offense giving rise to aiding and abetting liability, as required in the recent case of *People* v. *Mouton* (1993) 15 Cal.App.4th 1313 [19 Cal.Rptr.2d 423]. We conclude there was no error in the court's handling of the issues raised in parts I and II of the discussion. We also find no error in the issues discussed in part III, and publish our discussion of part III because of our conclusion that the rule set forth in *Mouton* is not well founded and is likely to lead to procedural and practical difficulties if trial courts attempt to adhere to it.

---

[2]All statutory references are to the Penal Code unless otherwise specified.

FACTS

The confrontations leading to this homicide are illustrative of juvenile conflicts which in another day might have resulted in a bloody nose, but in these times all too often lead to armed assaults. The scene of the crime was a street in Linda Vista, the turf of young people living in the Linda Vista area who frequented the Linda Vista Boys and Girls Club. The opposing faction, generally from Pacific Beach and including defendant Solis, belonged to the "Dead End 132 Compton Gang." Solis had spent evenings cruising with a girl from Linda Vista. On the evening of the homicide Solis, age 18, and his cousin named Lobato, age 12, were parked in a lot of the Boys and Girls Club, awaiting a meeting with a Linda Vista girl. They were confronted by Linda Vista youths, including the ultimate victim O'Brien, who angrily made threats and invited Solis and Lobato to fight. The Pacific Beach boys retreated, however, driving back to their home turf to meet with yet a third Dead End boy, "Ghost" Moffat.

Moffat was seen placing a gun in his waistband and getting into Solis's car. The three Dead End boys then returned to Linda Vista and, shouting vituperative and disparaging comments, drove by a group of Linda Vista youths, some of whom had earlier been at the Boys and Girls Club. This resulted in retaliation in the form of a barrage of beer bottles being thrown at Solis's car, causing yet another retreat.

The Dead End boys were not through, however. They returned to the Linda Vista scene with Solis driving and Moffat as a passenger. The vehicle approached with its lights off. Moffat leaned out the car window and fired three shots, after which the car sped away. One of the shots struck O'Brien, killing him.

Police arrested Solis when he arrived at his home. The gun used to kill O'Brien was found wrapped in a gray jacket in a nearby alley the next day. While Solis at first denied involvement in the killing, he later admitted that he had returned to Linda Vista in his car with his two friends, that Moffat had told him to turn off the lights as he drove by a group of Linda Vista youths, and that Moffat had fired out of the car window.

Testifying in his defense, Solis admitted participation in the various events leading up to the homicide, including the transportation of Moffat back to Linda Vista. While Solis admitted knowing that Moffat had a gun, he denied knowing or expecting that Moffat would use it for any purpose other than to shoot in the air to scare the opposing gang. He further testified that he had turned off his lights, at Moffat's bidding, heard shots and thought

someone was shooting at his car, and did not know that Moffat had fired his gun until later informed of it by his other passenger.

DISCUSSION

I., II.*

. . . . . . . . . . . . . . . . . . . . . . . .

III. *Asserted Mouton Error*

The evidence presented to the jury would have supported a guilty verdict on the theory that Solis, Moffat and Lobato were joint perpetrators of an intentional killing, Solis thus being a principal in the crime committed by Moffat by virtue of assisting in driving the car while Moffat fired the gun. If the jury believed some or all of Solis's testimony, however, it could have concluded that the criminal plan proposed by Solis involved merely a drive-by and brandishing of Moffat's firearm to scare the Linda Vista boys, but that Solis was guilty as an aider and abettor in a planned crime which foreseeably developed into a homicide. The case was submitted to the jury and presented by the prosecution on both theories.[4]

The appellate issue we discuss in this portion of our opinion relates only to the possibility that the conviction was based upon a finding of guilt by aiding and abetting. ▆▆ New instructional requirements were developed in *People* v. *Mouton, supra,* 15 Cal.App.4th 1313 for cases such as ours in which guilt may be based upon the derivative culpability of an aider and abettor. *Mouton* was published during the briefing of this appeal and not cited, nor were the issues raised by it referenced, in initial briefing. Supplementary briefing resulted in a vigorous claim by Solis that the failure to give instructions as prescribed in *Mouton* required reversal. We now address this issue.

In part II of our opinion we considered the contention that instructions on various lesser included or lesser-related crimes should have been given, noting that the only definitional instructions given were those pertaining to first degree and second degree murder. A somewhat more extended

---

*See footnote 1, *ante,* page 264.

[4]In *People* v. *Davis* (1992) 8 Cal.App.4th 28 [10 Cal.Rptr.2d 381] we held that when the evidence supports a possible conviction of the same crime on alternative theories—in that case as in this, either direct participation in the crime or as an aider and abettor—it is not necessary that the jurors unanimously agree on one theory or the other, so long as they unanimously agree on ultimate guilt for perpetration of the same crime. This issue was not raised by the appeal in this case.

discussion of the concept of lesser-included or lesser-related offenses, in the context of aider and abettor liability, is now appropriate.

■ As referenced above, principals to crime (that is, those who are equally responsible for its commission) include not only the actual perpetrator of the crime but one who aids or abets its commission. One can aid or abet by being present and assisting at the time of the crime (*People* v. *Villa* (1957) 156 Cal.App.2d 128, 133 [318 P.2d 828]) or, if not present at the time of commission, by advising or encouraging its commission. (§ 31.) One who aids and abets a crime is liable not only for a crime committed in accordance with the advice and encouragement given, but also for any other crime the perpetration of which by the direct actor was the natural and probable consequence of the criminal act encouraged. (*People* v. *Durham* (1969) 70 Cal.2d 171, 181 [74 Cal.Rptr. 262, 449 P.2d 198].) One may therefore become criminally liable for a crime committed independently by another (either within or outside the presence of the aider and abettor) if the original crime jointly contemplated could reasonably lead to the crime perpetrated. In such situation the aider and abettor's guilt is based not on his own actions, but on the actions of his partner in crime. The aider and abettor's liability is thus "derivative." As explained by Professor Kadish in *Complicity, Cause and Blame: A Study in the Interpretation of Doctrine* (1985) 73 Cal.L.Rev. 323, 337:

"The secondary party's liability is derivative [fn. omitted], which is to say it is incurred by virtue of a violation of law by the primary party to which the secondary party contributed. It is not direct, as it would be if causation analysis were applicable. That is ruled out by our concept of human action, which informs much of complicity doctrine. Volitional actions are the choices of the primary party. Therefore they are his acts and his alone. One who 'aids and abets' him to do those acts, in the traditional language of the common law, can be liable for doing so, but not because he has thereby caused the actions of the principal or because the actions of the principal are his acts. His liability must rest on the violation of law by the principal, the legal consequences of which he incurs because of his own actions.

"It is important not to misconstrue derivative liability as imparting vicarious liability. Accomplice liability does not involve imposing liability on one party for the wrongs of another solely because of the relationship between the parties. Liability requires action by the secondary actor—as we shall see, intentional action designed to persuade or help—that makes it appropriate to blame him for what the primary actor does. The term 'derivative' as used here merely means that his liability is dependent on the principal violating the law. What is at issue is the responsibility of the secondary actor for the

principal actor's violation of law. Unless the latter occurs there can be no accomplice liability."

■ Hence the progression of logic required to find one guilty as an aider and abettor, when the crime perpetrated was not that originally instigated, planned or advised, requires several steps. First the jury must determine the crime actually perpetrated by the acting criminal, which determination includes a particular definition of the crime committed and necessitates the giving of instructions as to that crime (including any lesser-included crimes that may be appropriate under the factual circumstances). If the principal actor is found not to have committed the crime, there can be no derivative liability no matter how evil the intentions of the would-be aider and abettor.[5]

A related determination must then be made by the jury to find the blameworthy conduct on the part of the person secondarily liable which constitutes him an aider and abettor. This conduct by definition is not that of the primary perpetrator of the crime; it is something else. In the class of cases in which the aiding and abetting consists of participation before the fact of the crime, or in acts which do not constitute the crime itself, the secondary party is liable because he facilitated or encouraged the commission of the crime. (*People* v. *Beeman* (1984) 35 Cal.3d 547, 560 [199 Cal.Rptr. 60, 674 P.2d 1318].) Most importantly for our case, the aider and abettor is liable not only for the crime that was intended or expected as a result of his encouragement, which we shall call the "predicate" crime, but also for any other crime which is the *"natural and probable consequence of the act encouraged."* (*People* v. *Durham, supra,* 70 Cal.2d at p. 181, quoting *People* v. *Villa,* 156 Cal.App.2d 134, italics added in *People* v. *Durham.*)

In order to assess derivative liability, therefore, the finder of fact must determine that the defendant encouraged or facilitated some sort of activity which foreseeably led to the ultimate crime. The defendant need not intend that the ultimate crime be committed, nor need he even personally foresee that it may be committed. It is enough that, objectively, it is reasonably foreseeable from the defendant's actions that the ultimate crime may occur. (*People* v. *Croy* (1985) 41 Cal.3d 1, 12, fn. 5 [221 Cal.Rptr. 592, 710 P.2d 392].)

---

[5]We recognize the somewhat overlapping concept of conspiracy, which can result in conviction even though the target crime planned in the conspiracy never took place, only an "overt act" having been perpetrated. (See 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Elements of Crime, § 156, p. 173.) While elements of conspiracy are often used for evidentiary purposes in the proof of aiding and abetting liability, the two concepts of derivative liability are separate (see 1 Witkin & Epstein, *supra,* at § 85, pp. 100-101) even though occasionally discussed in cases as if they were interchangeable (see *People* v. *Durham, supra,* 70 Cal.2d 171, 180-181; *People* v. *Kauffman* (1907) 152 Cal. 331, 335 [92 P. 861]).

■ It is clear that the predicate activity promoted by the defendant must be criminal in nature to subject him to derivative liability for the ultimate crime. As stated in *Croy, supra*, "It is the intent to encourage and bring about conduct that is *criminal* . . . that is an element of the target offense . . . ." (*People* v. *Croy, supra*, 41 Cal.3d at p. 12, fn. 5, italics added.) Again, as stated in *People* v. *Beeman, supra*, 35 Cal.3d at page 556: "There is no question that an aider and abettor must have criminal intent in order to be convicted of a criminal offense." Thus the encouragement of an act which is dangerous and may foreseeably lead to criminal acts cannot result in liability if the predicate act is not in itself criminal. For instance, encouraging a carful of Dead End gang members to drive by the Linda Vista club and yell insults at the Linda Vista boys would probably be dangerous advice, in that it could be seen to lead to violence, fights, assaults and various possible crimes. The utterance of insults, however, is not in itself criminal, the predicate act encouraged would not be a crime, and he who encouraged the act would not be liable for subsequent criminal conduct.

What, then, is the precise nature of the predicate act which must be established in order to impose derivative liability? As best we can conclude, it is no more than the promotion of generalized "criminal" conduct. In *People* v. *Luparello* (1986) 187 Cal.App.3d 410, 439 [231 Cal.Rptr. 832], the subject conduct is described as "encouraging or assisting or influencing the nefarious act." In *People* v. *Croy, supra*, 41 Cal.3d 1 the requisite conduct is described as "knowledge that an act which is criminal was intended, and . . . action taken with the intent that the act be encouraged or facilitated. . . ." (*Id.* at p. 12, fn. 5.) In *People* v. *Kauffman, supra*, 152 Cal. 331, 334 (the grandfather precedent in this line of cases) the key to derivative liability is a combination "together to commit *any unlawful act*." (Italics added.)

It can be seen, therefore, that it is possible for a confederate to become liable for the commission of a very serious crime when the target offense contemplated by his aiding and abetting may have been trivial. Indeed, this case may be an example of that principle. Solis was found guilty of murder when the predicate crime, at least as testified by Solis and conceivably accepted by the jury, was the misdemeanor of brandishing a firearm. Is it fair or reasonable to hold a defendant liable for a crime carrying a penalty of as much as 16 years to life in prison, as imposed here, when the crime intended and expected was only a misdemeanor? The answer is yes, and the reason is the existence of the safety valve provided by the requirement that the ultimate crime be a "natural and reasonable consequence" of the predicate offense.

If it is in fact reasonably foreseeable[6] that a serious crime may be the result of what commences as a misdemeanor, then the criminal accessory may be held responsible for the eventual felony. If the ultimate criminal conduct is not foreseeable in terms of the less culpable conduct originally contemplated, then the accessory is simply not guilty of any crime. For instance, when one urges a shoplifter to steal cigarettes for joint use, knowing the shoplifter to be a harmless drifter, there is no liability for the unexpected assault which occurs in the shop when the crime is thwarted. This is because under the circumstances known to the aider and abettor the trivially criminal conduct to be perpetrated by a known pacifist will not, under an objective standard of foreseeability, lead to serious consequences. (See dis. opn. of Sparks, P. J., in *People* v. *Woods* (1992) 8 Cal.App.4th 1570, 1604 [11 Cal.Rptr.2d 231].)[7]

Accordingly, the finder of fact need identify the nature of the predicate offense only in a generalized manner, reaching a conclusion that some "criminal" or "nefarious" conduct was intended by the defendant. The intent required to be shown respecting the predicate criminal act is only "the intent to encourage and bring about conduct that is criminal, not the specific intent that is an element of the [predicate] offense." (*People* v. *Croy, supra,* 41 Cal.3d at p. 12, fn. 5.) Further, it is not necessary to provide instructions as to the possible predicate crimes, which may or may not have been committed but are uncharged and irrelevant to the offense ultimately committed and charged. (*People* v. *Woods, supra,* 8 Cal.App.4th at pp. 1592, 1593.)

The reason we need not focus on the specifics of the predicate offense (at least where it is not a charged offense) is that the legal elements of the predicate offense are irrelevant to the determination of whether the ultimate crime was a natural and probable consequence of the predicate. Whether there is a nexus of foreseeability between the predicate and the perpetrated

---

[6]We here acknowledge our imprecision in using interchangeably such adjectives as "probable and natural," "natural and reasonable," and "reasonably foreseeable," a fault identified in *People* v. *Brigham* (1989) 216 Cal.App.3d 1039, 1050 [265 Cal.Rptr. 486] as infecting many appellate opinions. Since neither the Supreme Court nor any Court of Appeal has seen fit to focus on any one preferred phrase, we fall in line with the practice of using them interchangeably.

[7]Admittedly, this limitation of choices for criminal conviction of an aider and abettor, based on the conduct of the principal in crime, can pose a difficult decision for the jury. Either the aider and abettor is guilty of the serious crime committed by the actual perpetrator or he is not guilty at all. The jury in this case apparently would have liked to find the defendant guilty of some crime less than second degree murder, asking the court during its deliberations, "Are the 1st and 2nd degree murder charges the only verdict[s] the jury is limited to decide or can a lesser murder charge be considered?" This request does not support appellant's contention that additional instructions on possible lesser offenses should have been given; it does, however, illustrate the difficulty of effectively explaining derivative liability to lay jurors.

offenses depends not on crime definitions but on the specific *facts* of each offense. In this case, for instance, the jury was obliged to consider whether a plan to drive by the Linda Vista youths with a passenger equipped with a firearm, who could be expected to either brandish or fire the gun into the air, should objectively have raised in the mind of the aider the expectation of a possible homicide (including in this consideration the background of animosity that existed between the two groups). It makes no difference to this deliberation whether the drive-by and use of the gun be deemed misdemeanor brandishing, assault with a deadly weapon, or any other possible definitional crime. So long as it is understood that the activity is in fact in some way criminal (which is not disputed) there is no need to focus on the legal definition of the elements of the predicate crime.[8]

*People* v. *Mouton, supra,* 15 Cal.App.4th 1313 develops a contrary philosophy. The facts of that case bear some similarity to the facts of this case. After previous argumentative confrontations three men, including the defendant, returned to the scene of the confrontation. The defendant had no weapon, but one of his companions was armed with a gun. After a face-off with adversaries the companion fired shots which killed a bystander. The evidence suggested, and the prosecution admitted, that the group may have returned to the scene simply to make a show of force. The prosecutor identified the predicate crime, of which the defendant could have been found a participant in planning, to be any one or more of the following: carrying a concealed weapon, brandishing a weapon, perpetrating an assault with a deadly weapon, or shooting at an apartment.

 The error found by the appellate court was in the trial court's failure to specify and define the potential predicate offenses (or "target" offenses as referred to in the opinion). (*People* v. *Mouton, supra,* 15 Cal.App.4th at p. 1318.) The court reasoned that in order to determine the natural and probable consequences of an originally contemplated crime the jury had to determine what the predicate crime was; and that the jury would be unable to come to a conclusion as to the predicate crime unless it had received instructions on its elements. Specifically, the court noted that one of the suggested predicate crimes was assault with a deadly weapon, one of the elements of which is an intent to commit a battery. Since the jury was not instructed on this element, it "could have determined the target crime was assault with a deadly weapon, without making the necessary determinations

---

[8]We recognize, of course, that if there is a dispute as to whether the predicate planned acts are criminal, a determination as to the nature of those acts and instruction on the criminal definitional nature of such will be required. In the ordinary case, however, as in this case, no defense is raised in terms of a contention that the predicate planned acts were not in some way "nefarious" or "criminal."

first, that [the perpetrator] intended to commit a battery and second, that defendant, as required for aider and abettor liability, intentionally assisted [the perpetrator] with knowledge he intended to commit a battery." (*Id.* at p. 1319.) The *Mouton* court considered this prejudicial error and reversed the conviction.

As indicated by our prior discussion, we believe that this enlargement of jury instructions and the required additional jury deliberation thereby imposed are both unnecessary and unwise. Our random review of cases presently before our court in this general area of the law suggests that prosecutors commonly adopt the approach of the district attorneys in *Mouton* and in this case. This approach is to advise the jury in a general fashion as to the "nefarious" conduct in which the aider and abettor participated, assuming without extensive definition that the objective of such conduct is "criminal." Absent some objection from the defense, as would be imposed should it appear that the predicate objective in fact was not criminal, there is no need to identify or define further the predicate conduct or objective.

The instructions which must be absorbed by a jury in order to establish derivative liability are not, we maintain, facilely understandable. The jury is at best faced with the difficult task of comprehending that the defendant may be found guilty of a crime he did not personally commit, and in fact a crime which he may not have actually anticipated. Certainly nothing in terms of clarity, therefore, will be gained by adding to the jury's task the burden of determining the precise nature of the crime the defendant thought was to be committed, particularly when that crime was never perpetrated.

We find indirect support for our thesis in *People* v. *Davis* (1992) 8 Cal.App.4th 28, 44, 45 [10 Cal.Rptr.2d 381]. The jury there was also faced with determining guilt on a theory which could rest on derivative liability. The evidence also supported, however, a finding of direct participation in the crime. The court determined that so long as the jury agreed on ultimate guilt, it was not necessary that it reach unanimity on the *theory* (direct participation or aiding and abetting). In refusing to require instructions or agreement on the theory of guilt, the court stated: "We conclude the complexity of the law and the complexity of criminal conduct make any other position so potentially instructionally difficult, and complicated, and so potentially confusing to jurors that any other rule is, as a practical matter, unacceptable." (*Id.* at p. 44.)

We reach the same conclusion regarding the contention that the jury should be required to reach and manifest agreement as to the identity and elements of the predicate crime. If, as would be the case here, the predicate

crime could have been any one of several, the court would be required to give multiple alternative instructions, and presumably would require the return of special verdicts on these instructions. All such procedures would have a tendency to extend and confuse jury deliberations without, in our opinion, adding anything of benefit in terms of protection of the rights of the defendant.

We therefore reject the contention that instructions on, and deliberations to determine, the predicate crime are appropriate in a case based on aider and abettor liability, where the predicate crime is not itself charged. Accordingly, the refusal of the court in this case to give such instructions was not error.

IV. *Disposition*

The judgment is affirmed.

Todd, Acting P. J., and Huffman, J., concurred.

A petition for a rehearing was denied December 14, 1994, and appellant's petition for review by the Supreme Court was denied March 3, 1994. Kennard, J., and Baxter, J., were of the opinion that the petition should be granted.