[No. A052632. First Dist., Div. Three. May 18, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
IRVING MOUTON, Defendant and Appellant.

## COUNSEL

Dennis P. Riordan, under appointment by the Court of Appeal, Riordan & Rosenthal, Michael A. Levy and Dylan L. Schaffer for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, John H. Sugiyama and Ronald A. Bass, Assistant Attorneys General, Morris Beatus, Laurence K. Sullivan and David D. Salmon, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WERDEGAR, J.**—Irving Mouton appeals his convictions for second degree murder (Pen. Code, § 187)[1] and being an accessory to a felony (§ 32). He raises several issues regarding application of the "natural and probable consequences" rule for extended liability of an aider and abettor, as well as other claims of error. We conclude the court's failure to instruct on the target crimes defendant assertedly aided and abetted was prejudicial error. We therefore reverse the murder conviction. We affirm the conviction of being an accessory to a felony.

### FACTS

This was a particularly senseless killing. Although it originated with a lovers' quarrel, neither the man who shot the gun nor the intended target of

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

the shooting was involved in that quarrel. The bullets, moreover, missed their target, and one of them hit a completely uninvolved bystander, who died. Defendant was prosecuted on the theory he aided and abetted the shooting.

On the evening of July 1, 1990, Albert Reed had an altercation with his girlfriend Candy at an apartment complex in East Palo Alto. The police were called, and Reed argued with the officers. Reed eventually calmed down, and the officers left.

Sometime later that night, Candy's brother Tony and her cousin Tometrius, called "T," arrived at the complex armed with guns. They said they were tired of Reed fighting with Candy. Residents of the complex demanded they leave with their guns, and they complied.

When Reed went to apartment 140, where several of his friends were spending the evening, he learned that Tony and T had been at the complex with guns. Reed became nervous and talked about getting some "manpower" of his own.

Around 11 p.m. or midnight, Reed drove to the store with Maurice McDonald and Corey Warren. As they were returning, they encountered defendant and Raymond Jackson near the security gate to the complex. Reed jumped out of the car to talk to defendant and Jackson. According to McDonald, Reed said, "Those niggers want some funk." McDonald understood "funk" to mean trouble. Defendant looked into the car and said, "Who? Who?" Reed said, "No, not them." Defendant excitedly said, "We'll go get some heat." Reed told defendant to meet him at the back of the complex. Defendant and Jackson walked off, while the others returned to apartment 140.

Warren heard Reed tell defendant and Jackson, "Hey, you, two guys want some funk. Get the nine milli [nine-millimeter handgun] and the Uzi." After talking to defendant and Jackson for half a minute, Reed got back in the car and said, "Let's see the fools try something now."

Defendant was 20 years old at the time of the offense; Jackson was 17. About a month earlier, defendant had been to a party at apartment 140. Regina Rushing, one of the residents, remembered him from the party. Jackson, however, was a stranger to her.

Jackson and defendant came to apartment 140 sometime after the meeting with Reed. They walked in, but Conray Blackburn escorted them out because he thought they probably had guns. Reed left the apartment to join

them; some minutes later the three returned to the door. Blackburn and Jessie Stratton, who with Regina Rushing rented the apartment, again told Reed, defendant and Jackson to leave.

Blackburn confronted Reed, Jackson and defendant outside the door to the apartment. Blackburn was angry and spoke "face-to-face" with Jackson, telling him to respect Stratton's and Rushing's house and leave. According to McDonald, Blackburn used "average" profanity.

Jackson said, "What nigger?"; he then backed up, pulled a gun from his waistband and shot at Blackburn from a distance of about nine feet. He fired three times. One of the shots killed Beatrice Jackson, who was standing with others near the apartment doorway.

After the shots, Blackburn saw defendant by a fire hydrant. According to Blackburn, defendant pulled out a gun, but Reed "dove" in front of him and they left.[2] Warren heard Reed say, "No, Man, don't spray," but he did not know to whom that was directed.[3] Stratton testified that after the shots defendant started to run. Reed grabbed him and said, "No, Man, don't do it."

The shooting was reported in a "911" call at 1:04 a.m. Defendant, Reed and Jackson were arrested together outside defendant's house at 1:54 a.m. A jacket Jackson had worn during the shooting was found in defendant's car, which he had left at a neighbor's house sometime during the night of the shooting. Gunshot residue was found on defendant's hands, but not on Reed's or Jackson's. Defendant could have acquired the residue by firing a weapon, handling one or shaking hands with someone who had fired a weapon. In his first statement to police, defendant denied being at the apartment complex at all.

Defendant testified he was on his way home from a friend's house when he was greeted by Jackson. As they stood talking, Reed jumped out of a car. Reed said he had had an argument with his girlfriend and suggested defendant come with him to his girlfriend's house. Defendant asked why he needed all three of them to go talk to his girlfriend. Reed said (either then or at some previous time; defendant's testimony is unclear) that he and defendant should spend some time together, so as to get "close to each other." They passed Tony and another man, and Reed told defendant the men had guns. Reed went into apartment 140. When he emerged, Blackburn came with him.

---

[2]Blackburn was partly impeached on this point with his statement to police that he "really" did not see a gun and did not know "exactly" what defendant got out of the bushes.

[3]Warren defined "spray" as a term used "when you got an automatic weapon, and you're just going to open fire in any direction. Just unleash all your bullets."

Blackburn was swearing angrily at Jackson, his face very close, telling him they had to leave. Jackson and Blackburn moved out of defendant's view. He heard shots and ran. Later, he was approaching his house when Jackson and Reed ran up to him.

DISCUSSION

### I. *Liability as an Aider and Abettor*

The prosecutor relied solely on an aiding and abetting theory, conceding defendant did not himself kill the victim. She further conceded that defendant, Jackson and Reed did not form a plan to kill Conray Blackburn. Instead, she argued, they set out to "make a show of force, to back up their home boy," to exhibit their weapons in a "challenging way to anyone who would get in their face at Apartment 140." She suggested their "target crime" might have been "to carry a concealed weapon, . . . to brandish a weapon, to exhibit, to point a weapon, which is also a crime, pointing, assaulting with a deadly weapon, or even to shoot at the apartment at 140 . . . ." She then argued the "shooting was the natural and probable consequence of their plan to make a show of force, to come in with their armed boys to Apartment 140."

In addition to instructions explaining that one who aids and abets a crime is liable as a principal (CALJIC No. 3.00 (5th ed. 1988 bound vol.))[4] and defining aiding and abetting (CALJIC No. 3.01), the jury was instructed with CALJIC No. 3.02, as follows: "One who aided and abetted is not only guilty of the particular crime which he knows his confederates are contemplating committing, but he is liable for the natural and probable consequences of any criminal acts that he knowingly and intentionally aided and abetted. [¶] You must determine whether the defendant is guilty of the crime originally contemplated. And, if so, whether the crime charged in Count One was a natural and probable consequence of such originally contemplated crime."

 Defendant complains the court erred in failing to instruct the jury sua sponte on the elements of the predicate offenses relied on in the prosecutor's closing argument, offenses defendant describes as "assault with a deadly weapon, brandishing, or possession of a firearm." The jury, he maintains, was thus asked to determine defendant's guilt of offenses whose elements were unknown to it and concerning which it lacked instruction as to the prosecutor's burden of proof beyond a reasonable doubt.

We agree the court erred in failing to specify and define the target offenses. In a criminal case, even absent a request, the trial court has

---

[4]Unless otherwise indicated, all further CALJIC references are to the fifth edition, 1988 bound volume.

the obligation to instruct the jury on all general legal principles raised by the evidence and necessary for the jury's understanding of the case. (*People* v. *Wickersham* (1982) 32 Cal.3d 307, 323 [185 Cal.Rptr. 436, 650 P.2d 311].)

In the instant case, pursuant to the version of CALJIC No. 3.02 given by the court, the jury was required to determine whether defendant was "guilty of the crime originally contemplated" and, if so, whether the crime of murder charged in count 1 was a "natural and probable consequence" of the originally contemplated crime. Although in closing argument the prosecutor listed a series of possible crimes originally contemplated, ranging from carrying a concealed weapon, to assault with a deadly weapon, to shooting at an inhabited dwelling, or a "conspiracy to commit any one of those crimes . . . ," at no time did *the court* either specify for the jury the originally contemplated crimes or define them. Nor, moreover, did the court inform the jury that the commission of such offenses must be proven beyond a reasonable doubt. The jury, therefore, was left to determine defendant's guilt of the ultimate offense—the charged murder—without guidance concerning the identity or definition of the originally contemplated (or target) offenses and without instruction as to the beyond-a-reasonable-doubt burden of proof concerning those offenses.

The omission was prejudicial. One of the suggested offenses, assault with a deadly weapon, requires the perpetrator have a "general criminal intent," defined as an intent to commit a battery. (See CALJIC No. 9.00 ["Assault— Defined"], ¶ 3; see also *People* v. *Lathus* (1973) 35 Cal.App.3d 466, 469-470 [110 Cal.Rptr. 921].) As the Use Note to CALJIC No. 9.00 directs, the reference in the assault instruction to the intent to commit a battery should be given if prosecution is for assault with a deadly weapon or by means of force likely to cause great bodily injury. In the instant case, not having been instructed on this element, the jury could have determined the target crime was assault with a deadly weapon, without making the necessary determinations first, that Jackson intended to commit a battery and second, that defendant, as required for aider and abettor liability, intentionally assisted Jackson with knowledge he intended to commit a battery.[5] (*People* v. *Beeman* (1984) 35 Cal.3d 547, 560-561 [199 Cal.Rptr. 60, 674 P.2d 1318]; CALJIC No. 3.01.)

In 1992, CALJIC No. 3.02 was revised to provide as follows: "One who aids and abets [another] in the commission of a crime [or crimes] is not only

---

[5]As the Attorney General observes, the court did define assault, including the requirement that an unlawful attempt "to apply physical force upon the person of another . . ." be made. This instruction, however, was in the context of whether Jackson's use of deadly force was justifiable or less culpable, as in response to an assault by the occupants of apartment 140, and was not connected in any way to defendant's liability as an aider and abettor of the target offense of assault with a deadly weapon.

guilty of [that crime] [those crimes], but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crime[s] originally aided and abetted. [¶] In order to find the defendant guilty of the crime[s] of _____, [as charged in Count[s] _____,] you must be satisfied beyond a reasonable doubt that: [¶] (1) The crime [or crimes] of _____ [was] [were] committed, [¶] (2) The defendant aided and abetted such crime[s], [¶] (3) A co-principal in such crime committed the crime[s] of _____, and [¶] (4) The crime[s] of _____ was a natural and probable consequence of the commission of the crime[s] of _____." (CALJIC No. 3.02 (1992 rev.) (5th ed. pocket pt.).) The Use Note to CALJIC No. 3.02 (1992 rev.) (5th ed. pocket pt.) page 24 states that the instruction must be accompanied by instructions defining all the crimes encompassed in the instruction.

■ We believe CALJIC No. 3.02, as revised, correctly sets forth a defendant's vicarious liability for an offense that is the natural and probable consequence of an offense the defendant aids and abets, as well as the findings the jury must make in order to find the defendant guilty of the ultimate offense. We further agree that instructions defining the postulated target crimes should be given in connection with CALJIC No. 3.02. Although failure to define the target offenses is not, in our view, reversible per se, where, as here, the legal definition of an offense such as assault "is not one commonly understood by those familiar with the English language" (*People* v. *McElheny* (1982) 137 Cal.App.3d 396, 403 [187 Cal.Rptr. 39]), failure to define the offenses may be prejudicial.

■ In this case, the court's error in failing to instruct on the target offenses was compounded by an instruction the court did give, albeit with defendant's acquiescence, listing several factors the jurors were told they might, but were not required to, consider in determining if defendant aided and abetted Jackson's commission of the target crime. The factors were: "One, prior agreement to commit the crime; two, prior threat of harm; three, companionship between principal and the aider and abettor; four, presence at the crime scene, for example, standing ready to assist; five, participation in the crime or attempted participation which was prevented by another person; six, conduct before and after the crime including continuous physical association with the principals; seven, failure to aid the victim; eight, flight in the company of the principal; nine, false statements evincing a consciousness of guilt."

The instruction was given immediately after CALJIC No. 3.01, defining aiding and abetting, and before CALJIC No. 3.02, stating an aider and abettor's liability for the natural and probable consequences of a criminal act

knowingly aided and abetted. As defendant points out, some of the factors stated as indicative of guilt are unsupported by any authority (e.g., failure to aid the victim). More importantly, the entire instruction was simply a list of the prosecution evidence and, as such, was argumentative and little more than a guidepost to conviction. (See *People* v. *Gordon* (1990) 50 Cal.3d 1223, 1276 [270 Cal.Rptr. 451, 792 P.2d 251].)

The Attorney General argues that, even assuming error in the court's failure to instruct concerning the target offenses, it was not prejudicial because the defense did not dispute that the criminal acts asserted by the prosecutor were indeed criminal; rather, defendant denied making or hearing any statements about weapons at the security gate or having any gun that night. Defense counsel denied any shared intent at all. He argued the conversation at the gate "just didn't happen"; there was "[n]o knowledge, no scheme, no plan, no nothing."

Although superficially appealing, the Attorney General's argument overlooks that, even if the jury disbelieved defendant's denial, it still had the responsibility to determine beyond a reasonable doubt what the target offenses were, whether any of those offenses was in fact committed, and whether defendant knowingly and intentionally facilitated the commission thereof. Assuming the jury found against defendant on these issues, it was further required to determine whether the ultimate offense—the murder of Beatrice Jackson—was in fact a "natural and probable consequence" of the target offense. When, as here, the definition of at least one of the postulated target offenses is not a matter of common understanding, failure to instruct the jury on that offense necessarily precludes the jury from properly discharging these responsibilities.

## II. *Conviction of Both Murder and Accessory to Murder*

 Citing *People* v. *Prado* (1977) 67 Cal.App.3d 267 [136 Cal.Rptr. 521] and *People* v. *Francis* (1982) 129 Cal.App.3d 241 [180 Cal.Rptr. 873], defendant contends the jury should not have been permitted to convict him of both murdering Beatrice Jackson and being an accessory to her murder. He urges us to vacate or reverse the accessory conviction, whether or not the murder conviction is affirmed. Although we have reversed the murder conviction, we address defendant's argument because it impacts whether he can be retried on the murder charge.

In *People* v. *Prado, supra,* the defendant was convicted of robbery and acting as an accessory to the same crime by aiding his codefendant to escape. The trial court dismissed the accessory conviction and sentenced the

defendant on the robbery count. On appeal, the defendant argued the robbery conviction should be reversed because the jury's verdict of guilt on the accessory count was an implied acquittal of the robbery, hence the two verdicts were irreconcilable. The court agreed, stating: "[W]hen an accused is convicted of violation of Penal Code section 32, which necessarily requires that a *principal* have committed a specific completed felony and that he knowingly aided that principal with intent that the principal escape arrest, he cannot be convicted as a principal in that completed felony. His state of mind—the intent required to be an accessory after the fact—excludes that intent and state of mind required to be a principal." (67 Cal.App.3d at p. 273, italics in original.) The court noted that the rule of mutual exclusivity might not apply in "[e]xceptional factual circumstances." (*Id.* at p. 273, fn. 1.) In *Prado*, however, because "[e]ssentially the same acts" were relied upon to prove the defendant participated in the robbery as an aider and abettor and to prove he was an accessory after the fact, reversal was required; the court remanded to permit the prosecutor to seek reinstatement of the accessory conviction or to retry both counts with proper instructions that the defendant could be guilty of only one. (*Id.* at pp. 274, 277.)

No case since *Prado* has accepted its broad principle of mutual *factual* exclusivity or inconsistency between the offenses of principal and accessory; rather, the courts have assumed, without deciding, that convictions of being both a principal and an accessory, although not necessarily factually inconsistent, are precluded as a *matter of law* by virtue of legislative intent. Thus, in *People* v. *Francis, supra*, the court accepted the People's concession that multiple convictions of murder and accessory to murder were error and vacated the accessory conviction. (129 Cal.App.3d at pp. 246, 253.) The court, however, disagreed with the *Prado* court's rationale that the offenses were mutually exclusive or inconsistent: "Though the offenses are distinct and different, the elements of the crime of murder are not inconsistent with the elements of the crime of accessory to murder. One guilty of the former is not necessarily not guilty of the latter or vice-versa. If, as the People here concede, a defendant may not be convicted as both a principal and as an accessory to the same offense absent exceptional circumstances, it is not because the elements of the two offenses are inconsistent, but because the Legislature, in proscribing the conduct of an accessory to a felony, did not intend to embrace such conduct of the principal felon. [Citations.]" (*Id.* at p. 252.)

In *People* v. *Laskiewicz* (1986) 176 Cal.App.3d 1254 [222 Cal.Rptr. 686], the defendant was convicted of grand theft and being an accessory to grand theft. The trial court vacated the accessory conviction and sentenced the defendant on the theft charge. As in *People* v. *Prado, supra*, the defendant

argued it was reversible error not to instruct the jury the charges were mutually exclusive. The appellate court disagreed. "[A]ssuming the legal principle of mutual exclusivity is correct," the failure to instruct was not prejudicial under the facts, where it was "logical to presume that [the defendant] could be guilty of both offenses—as a principal in the initial planning and execution of the theft, and thereafter as an accessory in assisting his accomplice to flee the state and avoid detention." (*Id.* at p. 1257, fn. omitted.)

In accord with the criticism made in *Francis* and the distinction drawn in *Laskiewicz,* we believe *Prado* should be limited to the factual circumstance presented therein, i.e., to cases in which the two convictions rest upon "[e]ssentially the same acts." (*People* v. *Prado, supra,* 67 Cal.App.3d at p. 274.) Nothing in section 32, defining accessories, suggests the Legislature intended as a matter of law to exclude those who, having perpetrated or intentionally assisted in the commission of a felony, *then act further to harbor, conceal or aid the escape of another of the principals.*

In arriving at its general rule of mutual exclusivity, the court in *Prado* relied in part on treatises summarizing common law. (67 Cal.App.3d at pp. 271-272.) This reliance, however, is questionable in light of the significant differences between the common law of accessory and principal and California law as codified in the Penal Code. For example, one treatise states: "A principal in either the first or second degree may not also become an accessory after the fact by his subsequent acts. However, it has been held that one who was only an accessory before the fact may also be an accessory after the fact." (2 LaFave & Scott, Substantive Criminal Law (1986) § 6.9, p. 169, fns. omitted.) In California, however, the distinction between accessories before the fact and principals has been abrogated; those who under common law would have been accessories before the fact are simply prosecuted as principals in the crime. (§§ 31, 971.) The common law rule described by LaFave and Scott, therefore, cannot be adopted unaltered by California courts; translated into the terms of the Penal Code, the rule would suggest that some, but not all, principals may also be convicted as accessories.

*Prado* also relied, by analogy, on cases holding a thief cannot be convicted of both the theft and receiving the stolen property and, in particular, on *People* v. *Jaramillo* (1976) 16 Cal.3d 752 [129 Cal.Rptr. 306, 548 P.2d 706]. (67 Cal.App.3d at pp. 271, 273-274.) Yet *Jaramillo,* which concerned convictions for unlawful driving or taking of an automobile (Veh. Code, § 10851) and receiving stolen property (§ 496, former subd. 1), expressly recognized that convictions of both crimes would be proper if the evidence

established factually independent bases for the two convictions. Thus, if the evidence established the defendant did not intend to steal the car but only to drive it, an additional conviction for receiving would be proper if there was also "evidence of the independent theft of the vehicle and the accused's knowing receipt thereof." (16 Cal.3d at pp. 758-759, fn. omitted.) More generally, the court stated that the rule barring conviction for both theft and receiving does not apply "when there is evidence of complete divorcement between the theft and a subsequent receiving, such as when the thief has disposed of the property and subsequently receives it back in a transaction separate from the original theft . . . ." (*Id.* at p. 759, fn. 8.)

Similarly, there is no bar to conviction as both principal and accessory where the evidence shows distinct and independent actions supporting each crime. When a felony has been completed and a person knowingly and intentionally harbors, conceals or aids the escape of one of the felons, that person is guilty as an accessory to a felony under section 32, whatever his or her prior participation in the predicate felony. (See *People* v. *Wallin* (1948) 32 Cal.2d 803, 806-807 [197 P.2d 734] [actual killer could also be liable as accessory on theory that, after completion of the murder, she encouraged another to help her avoid arrest].)

The exclusivity rule of *Prado* does not apply here. As in *People* v. *Laskiewicz, supra,* 176 Cal.App.3d at page 1259, the failure to instruct on mutual exclusivity of convictions as accessory and principal was unlikely to mislead the jury as to facts required for each conviction. The prosecution theory of murder was based primarily on defendant's actions before and during the shooting incident: agreeing to make an armed show of force with Jackson and Reed, bringing Jackson to the apartment, and standing ready to assist with an additional weapon as Jackson confronted Blackburn. The prosecutor's argument for accessory guilt, in contrast, depended on defendant's help in concealing Jackson's jacket and gun and his false statements to the police. Unlike *People* v. *Prado, supra,* 67 Cal.App.3d 267, the two convictions were not based on the same acts.

Under these circumstances, defendant's responsibility both as an accomplice to the murder and for the separate and distinct crime of acting as an accessory to a felony was neither logically inconsistent nor legally prohibited. Although defendant was technically convicted of being an accessory to his own crime, in substance he was convicted for two different sets of

actions. The court, therefore, did not err in failing to instruct the jury the two offenses were mutually exclusive.[6]

Finally, defendant complains the prosecutor's special instruction concerning "affirmatively false statements" made to shield the perpetrator, as evidence on the charge of accessory, permitted the jury to conclude he was an accessory, even if the statements were made to protect himself, not Jackson.[7] The instruction could not have been misleading. It clearly identified Jackson as the perpetrator for purposes of the accessory charge, and it was given in conjunction with the standard instructions on the crime of acting as an accessory, which clearly distinguish between the accessory and the principal whom the accessory "harbors, conceals, or aids." The information, evidence and argument all made clear defendant was accused of assisting Jackson to avoid apprehension.

## DISPOSITION

That part of the judgment convicting defendant of murder is reversed. The judgment is otherwise affirmed.

Merrill, Acting P. J., and Chin, J., concurred.

A petition for a rehearing was denied June 14, 1993, and appellant's petition for review by the Supreme Court was denied August 19, 1993.

---

[6]With the prosecutor's agreement, the court stayed defendant's sentence on the accessory conviction.

[7]The instruction stated: "A factor which you may, but are not required to, consider in determining whether the defendant abetted or was an accessory to a felony committed by Raymond Jackson . . . is whether the defendant made affirmatively false statements to police officers with the intent to shield the perpetrator of the crime. . . ."