[No. A058400. First Dist., Div. Two. July 31, 1997.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID R. HICKLES, Defendant and Appellant.

## COUNSEL

A. J. Kutchins, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald D. Bass, Assistant Attorney General, Aileen Bunney and Laurence K. Sullivan, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KLINE, P. J.**—David R. Hickles was convicted by a jury of aiding and abetting the second degree murder (Pen. Code, §§ 187, 189) of Leon Garrett, and an arming enhancement (Pen. Code, § 12022, subd. (d)) was found true. On appeal, he challenges the jury selection process, raises several evidentiary and instructional errors, and claims the trial court erroneously denied his new trial motion. We conclude the trial court's failure to instruct on the predicate or target offense appellant allegedly aided and abetted was prejudicial error and we reverse.

STATEMENT OF FACTS

On July 3, 1991, the victim, Leon Garrett, was shot by a man known as "Heavy D"[1] at the Motel 5 on MacArthur Boulevard. The evidence established that appellant arrived with the gunman and was standing nearby at the time of the murder. The prosecution sought to prove accomplice liability on one of two theories: (1) appellant planned the murder with Heavy D, or (2) that he aided and abetted a target crime, e.g., assault, from which the murder was a natural and probable consequence, i.e., derivative liability.

Just prior to the murder, the victim, Garrett, had been living with appellant, Jarred Scott and Heavy D in an apartment on East 19th Street. Garrett's girlfriend, Brenda McKinley, had been living there also, but moved out a few weeks before. McKinley, a three-time felon, testified that she had never seen a gun in the apartment or in Garrett's possession.

After being served with an eviction notice, Garrett moved out of the apartment on July 1. On that day, Garrett's uncle, John Davis, drove him from the apartment to Motel 5. On July 2, Garrett telephoned Davis from the motel asking him to pick him up at 4 p.m. the next day, July 3, the day of the murder.

The only witness to the killing, besides appellant, was Teresa Washington. Washington testified that she visited her boyfriend, Jarred Scott, at Garrett's apartment several times. On several occasions she saw Garrett, appellant, and Heavy D inside the apartment. She saw no guns in Garrett's possession.

On the day of the murder she drove past Garrett's apartment and saw appellant and Heavy D standing on the sidewalk. Heavy D flagged her down. Appellant was standing on the sidewalk about three feet behind him. Appellant was wearing a white T-shirt with jeans, and Heavy D was wearing a matching tan shirt and pants. Heavy D asked her for a ride. She agreed and waited while the two men ran back into the apartment. When they returned, they asked her to drive them to see some friends.

Heavy D directed her to the motel. He instructed her to park in the street and let him out, rather than park in the motel's parking lot. He said he would be right back. Appellant exited the car, followed by Heavy D. She saw both men walk to the motel driveway. A few moments later, she pulled over to the curb and left her car with the motor running. This testimony conflicts with her version given at the preliminary hearing in which she said she had

---

[1]The name of the gunman was never revealed at trial. He was identified by several aliases: "Heavy D," "Big D," "Delano," Derrick," "Youngster," or "Big Youngster."

turned the engine off. Washington testified she got out of the car and walked to the motel.

Upon entering the motel grounds, she saw Heavy D on the second floor landing in front of Garrett's room shouting at him. She testified variously that when she first saw appellant he was on the same level as the other two men, was climbing up and down the stairs from "top to middle," or was standing a few feet behind Heavy D on the stairs. She said that while Garrett and Heavy D argued loudly for several minutes, appellant was just standing there looking, and did not say anything. She testified that at one point appellant had reached the landing, but this was contradicted by her preliminary hearing testimony in which she stated that appellant never stood on the landing. She admitted telling Sergeant Cheault that appellant had also been on the landing, and that he and Heavy D called out, "Dude, dude, what's up?" before Garrett walked out of his room. She testified that Garrett walked out the door looking scared. She did not see appellant pass a gun to Heavy D.

As she stood at the foot of the stairs, she saw a gun suddenly drop at Heavy D's feet, about one to two arms' lengths from appellant, who was then standing on the steps behind Heavy D. Heavy D picked the weapon up and shot Garrett three times as he walked away. By the third shot, appellant had run down the stairway. He was followed by Heavy D. Both men ran by Washington who was still standing at the bottom of the stairs covering her ears. Once inside the car, Washington heard Heavy D say, "We peeled that fool" as he shook appellant's hands. According to the witness, appellant wore a blank expression and said nothing. After driving a couple of blocks, Washington ordered both men out of her car.

After stopping briefly at her home, Washington drove to a barbershop where her boyfriend, Scott, worked. This was about 25 minutes after the shooting. Appellant entered a little later and sat down in a barber chair. She took Scott aside and told him "his friends just killed" Garrett. That night, Washington, Scott, appellant and his girlfriend, drove to a motel in Pinole and spent the night.

Several people in office buildings near the motel heard the shots and saw two or three people running out of the motel courtyard. Mary Stanton testified she saw a large, Black man dressed in khaki holding a gun to his side, walk to a dumpster and throw it in. She was unable to tell if the gunman or someone else opened the top to the dumpster. The police recovered a .357 magnum revolver with three live rounds and three expended casings from the dumpster. Three .38-caliber hollow point bullets were recovered from Garrett's body.

Diane Akers heard three gunshots, looked out the window of her office and observed a Black male and a heavyset Black female walk slowly from the motel driveway before breaking into a run.

Judith Heller heard three gunshots, looked out of her office window and watched as a small, Black male, apparently appellant, walk from the area of the dumpster, cross the street, and run away. He was followed by a heavyset couple, a Black man and woman, who ran towards a Chevrolet Nova and sped away. Heller supplied the police with the car's license number.

Jarred Scott testified he had been giving haircuts at the East 19th Street apartment ever since Heavy D had told him many young people in the neighborhood would visit the apartment. During May and June, Scott would cut hair three or four times a week and often slept at the apartment. Appellant often accompanied Scott to the apartment and spent the night. Scott testified that he saw two handguns (a .357 magnum and a .38-caliber revolver) and a rifle and saw Garrett clean the rifle. One time, Scott asked appellant if he could fire the .357 pistol.

During the week preceding Garrett's murder, appellant told Scott he was moving some clothes from the apartment. Scott told an investigator, though he denied it at trial, that appellant became upset when he learned Garrett had been served with an eviction notice and had the telephone serviced canceled after appellant had been paying rent to Garrett.

Scott testified that appellant did not arrive at his shop until 45 minutes after Washington, in contrast to Washington's version. According to Scott, appellant appeared to be in shock. Appellant told Scott that he was surprised Heavy D shot Garrett and that he did not want this to happen. Scott said appellant was not angry with the victim. He said appellant had called Pacific Bell to restart telephone service so Scott could continue to cut hair in the apartment.

A few days following the murder, appellant fled to Washington State where his mother lived. Scott telephoned him there. Appellant returned to Oakland in October 1991 and was arrested.

Stanley McGraw, a career criminal, agreed to testify for the prosecution if the People agreed not to prosecute him on recent charges for selling narcotics and to refrain from notifying his parole officer. On August 14, 1991, McGraw was arrested for selling heroin to an undercover officer. McGraw, also known as "Greedy," had more than five felony convictions, including assault with a deadly weapon, attempted murder and weapons offenses, and

was on parole for dealing drugs at the time of his arrest. Soon after his arrest, McGraw contacted Sergeant Raymond Conner and, according to Sergeant Conner, "right off the bat" offered information about Garrett's murder, saying it involved a .38-caliber hollow point bullet fired from a .357 magnum. McGraw told the officer that he got this information from a man named "Dave." McGraw also identified Scott's photograph as that of "Big Jay."

McGraw gave a lengthy, taped statement to the police which was read to the jury in edited form. In that interview, McGraw told Sergeant Conner he was buying crack from Dave (appellant) who sold it out of the victim's apartment together with "Big Jay" and "Youngster" (also know as Heavy D). McGraw told the officer the victim received cocaine in return for allowing Dave and his friends to sell crack from the apartment. The victim was evicted because he spent his rent money on drugs. McGraw stated he knew the victim owed Dave from $200 to $500.

After the victim moved out of the apartment and into the motel, the phone service was stopped. Dave got service restored by pretending to be Garrett, but when Garrett found out, he had the phone service terminated again. According to McGraw, Dave became upset over this because "Dave had mostly all the drugs. He was mostly in control of everything. He mostly told Youngster and Jay what to do." On the day of the murder, Dave told McGraw he had located the motel where Garrett was staying and asked McGraw to help "serve," i.e., beat up, Garrett. McGraw refused. McGraw stated appellant went with Heavy D and they were both armed.

The day following the murder, Dave visited McGraw and told him he was in trouble, that he and Youngster had gone to the motel in order to talk to Garrett "or to fight him behind getting the phone cut off." Dave told McGraw he "had the gun on him and he's the one that got to tussling with the guy. Dave told me when he, when he pulled out the gun, the guy seen the gun and tried to grab it and they got to wrestling for the gun and the gun dropped on the ground and him and, Big Youngster got, they was all tussling together. Big Youngster got loose and picked up the gun. Dave stepped back away from him and Big Youngster shot him three times in the chest area with the gun. . . . They left the car there at the scene of the crime also."

McGraw described the weapon and the hollow point bullets used to murder Garrett. McGraw stated he knew Dave bought the gun from his sister's boyfriend for $75. McGraw said Dave told him he threw the weapon off the Berkeley pier. Following the murder, defendant borrowed $175 from McGraw to visit his mother in Tacoma, Washington.

At trial, McGraw recanted his statement to Sergeant Conner, claiming he did not recognize or remember appellant because he was then under the influence of drugs. He recognized his voice on the tape and admitted the handwriting on the photographs he identified was his. He testified he was "high" that day and simply repeated what the police instructed him to say, it was all untrue, and that appellant never said anything to him. The witness testified he could not recall loaning appellant any money.

Sergeant Raymond Conner repeated the statements McGraw had given. He testified that he did not see any signs McGraw was under the influence or suffering withdrawal symptoms at the time of his statement.

Appellant testified he was good friends with the victim and had visited his apartment many times, but did not live there. He stated there was lots of traffic through the apartment and he assumed drugs were being sold. He also had seen Garrett cleaning a gun. On the afternoon of the murder, he was walking from class at Laney College to a friend's house where he had hoped to get a ride to A.J.'s barbershop when he saw Heavy D. After a brief conversation, appellant continued on his way when he saw Heavy D flag down Teresa Washington as she drove by. She agreed to drive him to the barbershop, after she dropped Heavy D off at some undisclosed destination. This version conflicts with Washington's, who testified that she saw appellant standing three feet behind Heavy D, when the latter flagged her down.

She drove them to the motel, where Heavy D got out of the car. Appellant and Washington waited for 15 minutes before they left and went looking for Heavy D. In contrast, Washington testified that appellant and Heavy D got out of the car at the same time and walked to the motel. Appellant testified that he and Washington saw Heavy D arguing with Garrett on the second floor landing. Appellant sat down on the stairs leading to the landing and watched the two men. He testified he could not hear their conversation. Washington stood at the bottom of the stairs.

A few minutes later, Garrett and Heavy D began struggling. During this time, appellant walked towards them, and just before he reached the landing he saw a gun drop to the ground. Heavy D picked up the weapon and fired three shots into Garrett. Appellant testified he was already at the bottom of the stairs when he heard the second shot, and he and Washington were on their way out of the parking lot when the third shot was fired.

Once all three were in the car, Washington drove off. Some distance away, Heavy D ordered appellant out of the car. Appellant took a bus to the barbershop. A few days after the murder, he and a woman friend and his son

rode a bus to Tacoma and stayed with his mother. He returned to Oakland in October and was arrested on a warrant while riding in a car driven by Scott.

Appellant gave a different statement to the police. He told them that Garrett had introduced him to Heavy D, saying he was his nephew. Contrary to his trial testimony, he told the officers he had never seen Garrett with a gun in the apartment. He said that on the day of the murder, Washington picked him up at Laney College, "like she usually does." This statement was contradicted by Washington who testified that she had never picked him up at Laney College, and had given him a ride only a few times. Appellant also stated he told Washington to let him out of the car. When he arrived at the barber shop, he saw Scott, Washington and Heavy D.

## DISCUSSION

In our original opinion in this case, we concluded appellant's conviction had to be reversed because the trial court prejudicially erred in failing to instruct sua sponte on the target offense appellant allegedly aided and abetted. In determining the trial court had a duty to give such an instruction, we agreed with the analysis in *People* v. *Mouton* (1993) 15 Cal.App.4th 1313 [19 Cal.Rptr.2d 423] and disagreed with *People* v. *Solis* (1993) 20 Cal.App.4th 264 [25 Cal.Rptr.2d 184], which held instructions on predicate offenses would be required only if there was a dispute whether the acts in question were criminal. We further held the error in failing to give the instruction was reversible per se.

■ At the direction of the Supreme Court, we have now reconsidered our original opinion in light of *People* v. *Prettyman* (1996) 14 Cal.4th 248 [58 Cal.Rptr.2d 827, 926 P.2d 1013]. As will be discussed, Prettyman confirms our view that failure to instruct on the target offense was error but requires us to reconsider the question of prejudice.

In closing argument, the district attorney contended that the jury could find appellant guilty either as the perpetrator or as an aider and abettor under one of two theories: (1) that he and Heavy D went to the motel planning to kill Garrett; or (2) that the two men intended to assault Garrett and "rough him up," the natural and probable consequence of which was the murder. The district attorney suggested the evidence could support an inference appellant and Heavy D went to kill Garrett out of revenge—first degree murder—or planned to injure Garrett—second degree murder under the implied malice theory.

The jury was instructed on premeditated first degree murder (CALJIC No. 8.20), unpremeditated second degree murder (CALJIC No. 8.30), and implied malice second degree murder based on an intentional act dangerous to

human life (CALJIC No. 8.31). The trial court further instructed the jury that an aider and abettor is liable as a principal (CALJIC No. 3.00) and defined aiding and abetting (CALJIC No. 3.01). The court additionally instructed on derivative accomplice liability contained in the former version of CALJIC No. 3.02 (5th ed. 1989) as follows: "One who aids and abets is not only guilty of the particular crime that to his knowledge his confederates are contemplating committing, but he's also liable for the natural and probable consequences of any criminal act that he knowingly and intentionally aided and abetted. You must determine whether the Defendant is guilty of the crime originally contemplated and, if so, whether the crime charged was such a natural and probable consequence of such originally contemplated crime." At no time did the trial court's instructions identify any potential target crime or define its elements.

The jury's verdict indicates it relied upon the natural and probable consequences doctrine. By refusing to return a verdict of first degree murder, the jury necessarily rejected any contention appellant planned to kill Garrett with Heavy D. It also necessarily rejected the theory that appellant was an accomplice to unpremeditated second degree murder, an express malice crime requiring a specific intent to kill. Although the jury was instructed on implied malice second degree murder, the evidence does not support appellant's conviction as the perpetrator on this theory, as the intentional act to which criminal liability might attach under this theory would be the "roughing up" or assaulting of Garrett and that act did not result in Garrett's death. (Cf. *People* v. *Nieto Benitez* (1992) 4 Cal.4th 91, 98-99, 106-108 [13 Cal.Rptr.2d 864, 840 P.2d 969] [misdemeanor brandishing of firearm supports conviction of implied malice murder].) Since it was uncontradicted that Heavy D picked up the gun and shot Garrett, the jury must have adopted the theory that defendant aided and abetted the target crime, which naturally and probably resulted in the murder.

"[A]n aider and abettor is a person who, 'acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime.'" (*People* v. *Prettyman, supra*, 14 Cal.4th at p. 259, quoting *People* v. *Beeman* (1984) 35 Cal.3d 547, 561 [199 Cal.Rptr. 60, 674 P.2d 1318].) "'[An aider and abettor] is guilty not only of the offense he intended to facilitate or encourage, but also of any reasonably foreseeable offense committed by the person he aids and abets. . . . [¶] It follows that a defendant whose liability is predicated on his status as an aider and abettor need not have intended to encourage or facilitate the particular offense ultimately committed by the perpetrator. His knowledge that an act which is

criminal was intended, and his action taken with the intent that the act be encouraged or facilitated, are sufficient to impose liability on him for any reasonably foreseeable offense committed as a consequence by the perpetrator. It is the intent to encourage and bring about conduct that is criminal, not the specific intent that is an element of the target offense, which . . . must be found by the jury.' ([*People* v. *Croy* (1985) 41 Cal.3d 1,] 12, fn. 5 [221 Cal.Rptr. 592, 710 P.2d 392].) ▮ Thus, under *Croy*, a defendant may be held criminally responsible as an accomplice not only for the crime he or she intended to aid and abet (the target crime), but also for any other crime that is the 'natural and probable consequence' of the target offense." (*People* v. *Prettyman, supra*, 14 Cal.4th at p. 261.)

"[W]hen a particular aiding and abetting case triggers application of the 'natural and probable consequences' doctrine, the *Beeman* test applies, and the trier of fact must find that the defendant, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of a predicate or target offense; (3) by act or advice aided, promoted, encouraged or instigated the commission of the target crime. But the trier of fact must also find that (4) the defendant's confederate committed an offense *other than* the target crime; and (5) the offense committed by the confederate was a natural and probable consequence of the target crime that the defendant aided and abetted." (*People* v. *Prettyman, supra*, 14 Cal.4th at p. 262, fn. omitted.)

▮ In *People* v. *Prettyman, supra*, 14 Cal.4th 248, the Supreme Court agreed with the conclusion of *People* v. *Mouton, supra*, 15 Cal.App.4th 1313, that the trial court has a duty to instruct sua sponte on the elements of the target crimes a defendant may have aided and abetted. The court explained that identification of the target crime would "facilitate the jury's task of determining whether the charged crime allegedly committed by the aider and abettor's confederate was indeed a natural and probable consequence of any uncharged target crime that, the prosecution contends, the defendant knowingly and intentionally aided and abetted." (*Prettyman, supra*, 14 Cal.4th at p. 267.) "[A]n instruction identifying and describing potential target offenses is necessary to minimize the risk that the jury, generally unversed in the intricacies of criminal law, will 'indulge in unguided speculation' (*People* v. *Failla* [(1966) 64 Cal.2d 560,] 564 [51 Cal.Rptr. 103, 414 P.2d 39]) when it applies the law to the evidence adduced at trial." (*Ibid.*) Although the jury need not unanimously agree on the target crime the defendant aided and abetted, "each juror must be convinced, beyond a reasonable doubt, that the defendant aided and abetted the commission of a *criminal act*, and that the offense actually committed was a natural and probable consequence of that act. Contrary to *Solis*, a conviction

may not be based on the jury's generalized belief that the defendant intended to assist and/or encourage unspecified 'nefarious' conduct. To ensure that the jury will not rely on such generalized beliefs as a basis for conviction, the trial court should identify and describe the target or predicate crime that the defendant may have aided and abetted." (*Id.*, at p. 268, fn. omitted, italics in original.) "The trial court should grant a prosecutor's request that the jury be instructed on the 'natural and probable consequences' rule only when (1) the record contains substantial evidence that the defendant intended to encourage or assist a confederate in committing a target offense, and (2) the jury could reasonably find that the crime actually committed by the defendant's confederate was a 'natural and probable consequence' of the specifically contemplated target offense." (*Id.*, at p. 269.)

■ Plainly, under *Prettyman*, the trial court in the present case erred in failing to give jury instructions "identifying and describing each potential target offense supported by the evidence." (14 Cal.4th at p. 270.) *Prettyman* rejected, however, the view that this instructional error is akin to failing to instruct on elements of the offense charged. (*Id.*, at pp. 270-271.) Rather, the court viewed the instructional error as creating an ambiguity, constituting federal constitutional error only if " ' "there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' " (*Id.*, at p. 272, quoting *Estelle* v. *McGuire* (1991) 502 U.S. 62, 72 [112 S.Ct. 475, 482, 116 L.Ed.2d 385].)

*Prettyman* found no such reasonable likelihood because in that case the parties made no reference to the natural and probable consequences doctrine in arguments to the jury, making it "highly unlikely" the jury relied on that doctrine instead of accepting the prosecutor's argument that the defendant was an accomplice to the offense of murder. (14 Cal.4th at p. 273.) Even if the jury had relied on the natural and probable consequences doctrine, the Supreme Court found little likelihood the jury would have misapplied the doctrine, as the only target offense shown by the evidence was an assault with a deadly weapon. As a matter of state law, *Prettyman* found the error in failing to identify and define target offenses was harmless because the prosecution's theory that the defendant had assisted or encouraged the perpetrator to commit murder was amply supported by the evidence. (*Id.*, at p. 274.)

■ The present case differs markedly from *Prettyman*. First, the prosecutor *did* stress the natural and probable consequence doctrine as a theory of liability. Second, as we have stated, the jury's verdict indicates this was the theory upon which it relied. Third, the conflicts in the evidence were such that it cannot be said the only target offense shown by the evidence was

one that would support a murder conviction under the natural and probable consequences doctrine.

The evidence regarding appellant's intent in going to the motel and conduct at the time of and after the murder was conflicting. For example, McGraw's statement to the police indicated appellant had been angry with Garrett over Garrett's using rent money to buy drugs and having the telephone service cut off; had gone with Heavy D, both armed, to "serve" (beat up) Garrett, "talk to" or "fight him behind getting the phone cut off"; and had tussled with Garrett and pulled out the gun which Heavy D then shot. By contrast, Scott testified that appellant had not been angry with Garrett over the eviction or telephone service and had not wanted Garrett to be shot, and Washington testified that appellant had not taken part in the fight with Garrett and was two or more arms' lengths away from Heavy D when the gun appeared. The credibility of McGraw's statement to the police was cast in some doubt by his recantation at trial and by the fact that some of the details of the statement were specifically refuted by other evidence. For example, while McGraw told the police appellant had said he threw the gun off the Berkeley pier, an eyewitness saw the perpetrator put the gun into a dumpster and the police recovered the gun from that dumpster. While McGraw told the police appellant, Heavy D and Washington left the car at the scene of the homicide, Washington testified that she, appellant and Heavy D drove the car away from the scene. There is no basis in the record to conclude the jury necessarily rejected Washington's or Scott's testimony regarding appellant's actions and intent. Depending on what portions of the evidence jurors credited, they might have believed appellant went to the motel with Heavy D (1) for the purpose of killing Garrett or assaulting him with a deadly weapon; (2) for the purpose of assaulting and battering him ("roughing him up") without knowledge that Heavy D was armed with a deadly weapon; or (3) merely for the purpose of engaging in a verbal argument with him.

In *Prettyman*, to illustrate how identification of the target crime would facilitate the jury's determination of the applicability of the natural and probable consequences doctrine, the Supreme Court stated: "If, for example, the jury had concluded that defendant . . . had encouraged codefendant . . . to commit an assault on [the victim] but that [defendant] had no reason to believe that [codefendant] would use a deadly weapon such as a steel pipe to commit the assault, then the jury could not properly find that the murder of [the victim] was a natural and probable consequence of the assault encouraged by [defendant]. (*People v. Butts* [(1965) 236 Cal.App.2d 817,] 836 [46 Cal.Rptr. 362].) If, on the other hand, the jury had concluded that [defendant encouraged [codefendant] to assault [the victim] with the steel pipe, or by

means of force likely to produce great bodily injury, then it could appropriately find that [codefendant's] murder of [the victim] was a natural and probable consequence of that assault." (*People* v. *Prettyman, supra,* 14 Cal.4th at p. 267.)[2]

The Supreme Court's example in *Prettyman* demonstrates the problem in the present case. Unlike the situation in *Prettyman,* where the *only* potential target crime shown by the evidence was an assault with a deadly weapon, here the evidence could support a jury's determination that appellant knowingly and intentionally aided and abetted a murder, an assault with a deadly weapon, a simple assault, or even an argument. Without instruction, the jury could not be expected to know the legal definitions of offenses potentially shown by the evidence, posing a clear opportunity for the " 'unguided speculation' " *Prettyman* sought to avoid. (14 Cal.4th at p. 267.) If the jury believed that appellant intended to aid, encourage or facilitate Heavy D in arguing with Garrett about the eviction and telephone service issues but was not convinced appellant shared any purpose of assaulting Garrett, appellant's conviction could have been improperly based upon his encouragement of a noncriminal act. (*People* v. *Prettyman,* 14 Cal.4th at p. 273.) If the jury had believed appellant intended to aid, encourage or facilitate an assault and battery of Garrett but had no knowledge Heavy D was armed and no intention to aid and abet an altercation involving force likely to produce great bodily injury, appellant's conviction could have been improperly based upon his encouragement of an offense that could not support a finding of murder as a natural and probable consequence. (*People* v. *Prettyman,* 14 Cal.4th at p. 267.)

The present case is similarly distinguishable from our recent opinion in *People* v. *Lucas* (1997) 55 Cal.App.4th 721 [64 Cal.Rptr.2d 282], upon which the Attorney General relies. In *Lucas,* we found no reversible error where the evidence showed only two potential target crimes upon which a reasonable juror could have focused, both of which could have been viewed as leading to murder as a natural and probable consequence. Here, as has been discussed, the evidence would have supported a number of different factual scenarios. While it is clear not all of those scenarios would support a natural and probable consequences finding as a matter of law (*People* v. *Prettyman, supra,* 14 Cal.4th at p. 267), it is not obvious a jury of laypersons, lacking instruction on target offenses, would not have viewed murder as a

[2]In *People* v. *Butts* (1965) 236 Cal.App.2d 817 [46 Cal.Rptr. 362], the victim was killed by the codefendant in a fight between the defendants and a group of boys. The court reversed the defendant's involuntary murder conviction because it found the evidence showed no reason to believe the defendant was aware the codefendant planned to use a deadly weapon (as opposed to his fists) in the fight. (*Id.,* at pp. 836-837.)

natural and probable consequence of a simple assault or even an argument, perhaps on a generalized view that things can get out of hand in such altercations.

While *Prettyman*'s (and *Lucas*'s) discussion of prejudice is couched in terms of avoiding a jury's mistaken application of the natural and probable consequences doctrine to a noncriminal act, failure to instruct on target offenses must be viewed as similarly prejudicial if it would allow a jury to apply the doctrine to a crime that could not properly be found to have murder as a natural and probable consequence. In this latter situation as well the absence of instruction on target offenses creates the opportunity for misapplication of the natural and probable consequences doctrine. In the present case, there is at least a reasonable likelihood the jury could have misapplied the natural and probable consequences instruction to allow conviction based upon a target offense that either was not criminal or could not properly be found to have murder as a natural and probable consequence. Accordingly, appellant's conviction must be reversed.

The judgment is reversed.

Haerle, J., and Lambden, J., concurred.